STATE OF NORTH CAROLINA v. JAMES EDWARD DAVIS

No. 60A81

(Filed 4 May 1982)

### 1. Criminal Law § 75.7— confession—no custodial interrogation—Miranda inapplicable

In a prosecution for first degree murder, *Miranda's* commandment that questioning cease when a suspect indicates he intends to exercise his Fifth Amendment privilege, did not apply where defendant was not taken into custody or otherwise deprived of his freedom of action in any significant way until after he had confessed to the murder in question. Defendant initially came to the detective offices voluntarily and unescorted; he was asked questions concerning the murder under investigation and made an exculpatory statement; defendant was offered a polygraph examination which he at first agreed to take but later refused, terminated the interview, and was given a ride home. Testimony further revealed that the officers asked to see the defendant at the detective offices again at approximately 10:00 in the evening; that defendant agreed to meet with them at that time; that the officers offered defendant a ride to the offices; that defendant was again interviewed in comfortable circumstances and his physical needs were cared for. The fact that on two occasions when defendant went to the bathroom during the second period of questioning, he was accompanied by a detective does not alter the overall conclusion that a reasonable person in defendant's position would have believed he was free to go at will. Nor did the failure to specifically advise defendant during either the first or second periods of questioning that he was free to go at any time indicate that he was not free to go at will. Further, the same facts which led to the conclusion that defendant was not taken into custody or otherwise deprived of his freedom of action in any significant way for purposes of the Fifth Amendment also lead to the conclusion that the defendant was not restrained in such a manner as to amount to being seized for purposes of Fourth Amendment analysis.

### 2. Criminal Law §§ 80, 88— victim's diary—admissibility—no denial of right to confront witnesses

The trial court properly admitted into evidence the diary of the deceased victim in which she stated "I got up at 8:15" since the diary entry was offered into evidence for the purpose of tending to show that the deceased was still alive at 8:15 a.m. on the day her body was found. The failure of the State to call the victim's grandson to testify that he saw his grandmother alive on the morning she was murdered had no relevance to the issue of the admissibility of the diary entry and did not deprive defendant of the right to confront witnesses against him.

### 3. Criminal Law § 102.7— prosecutor's argument to jury—credibility of law enforcement officers

Where the defense counsel in his argument to the jury attacked the credibility of the law enforcement officers testifying, the prosecutor was justified in responding to defense counsel and in defending the performance of

the investigating officers and the manner in which the State presented its case. Further, the defendant did not object to the challenged portion of the prosecutor's closing argument, did not take exception to it before the jury rendered its verdict, and the trial court did not have a duty to act *ex mero motu.*

**4. Homicide § 30.1— felony murder in the second degree—failure to instruct proper**

The trial court properly failed to instruct on the offense of felony murder in the second degree as this jurisdiction does not recognize such an offense. The sentence in G.S. 14-17 which states "all other kinds of murder, including (those proximately caused by the distribution of controlled substances) shall be deemed murder in the second degree" requires only that all intentional and unlawful killings with malice aforethought be classified as murder in the second degree, unless they have for one or more reasons been declared murder in the first degree by the express terms of the statute.

**5. Homicide § 24.1— instructions concerning use of deadly weapon—presumptions arising therefrom—proper**

The trial court's instructions concerning presumptions arising from the use of a deadly weapon did not deny the defendant the right to trial by jury guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, § 24 of the Constitution of North Carolina.

**6. Criminal Law § 135.4— G.S. 15A-2000(a)(2)—constitutionality**

The procedure set out in G.S. 15A-2000(a)(2) for death qualifying a jury prior to the guilt phase of a trial and requiring the same jury to hear both the guilt phase of the trial and the penalty phase of the trial is constitutional.

APPEAL from *Judge Lacy H. Thornburg,* presiding at the 23 February 1981 Criminal Session of BUNCOMBE Superior Court. Judgment was entered 6 March 1981.

The defendant was charged by bill of indictment, proper in form, with first-degree murder. Upon his plea of not guilty, a jury was impaneled as required in a capital case. The jury found the defendant guilty of murder in the first degree. During the sentencing phase of the trial, the State submitted as an aggravating circumstance that the murder was heinous, atrocious and cruel. The jury found that the aggravating circumstance was present but was insufficient to call for the death penalty. The defendant was sentenced to a maximum and minimum term of life imprisonment and appeals to this Court as of right pursuant to G.S. 7A-27.

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, and Ann B. Petersen, pro hac vice, for defendant-appellant.*

MITCHELL, Justice.

The defendant assigns error in the admission of his inculpatory statement to police, and in the refusal of the trial court to submit to the jury the possible verdict of felony murder in the second degree. For the reasons enunciated herein, we find that the defendant received a fair trial, free of prejudicial error.

The evidence for the State at trial tended to show that the body of Mrs. Myrtle Wilder was found in her home at approximately 6:00 p.m. on 16 August 1980. The deceased was found on her bed fully clothed but with her underpants around her knees. An initial examination of the body revealed seven or eight stab wounds, bruise marks at the base of the neck, slashed wrists and hemorrhages under the eyelids.

A later autopsy revealed that Mrs. Wilder had suffered eight stab wounds to the abdominal area, some as deep as five inches. The area around her neck was bruised with bruising and hemorrhaging into some of the organs around the neck and larynx. Her face was bruised and scraped, her wrists slashed and her neck broken.

Dr. John D. Butts, Senior Associate Chief Medical Examiner for the State of North Carolina and a forensic pathologist, testified that the hemorrhages under Mrs. Wilder's eyelids were consistent with death by asphyxiation through smothering or strangling. In his opinion, her broken neck would not have caused this condition, nor would strangulation ordinarily cause a broken neck. The manner in which Mrs. Wilder's neck had been broken was more consistent with a whiplash type injury. In Dr. Butts' opinion, the victim was alive when all of the injuries described were inflicted upon her. Due to the advanced age of the deceased and the condition of the body, Dr. Butts could not give an approximate estimate as to the time of her death. The examination of the deceased revealed no evidence of a sexual assault.

An investigation of the crime scene revealed a towel containing a portion of screen wire immediately outside the home. One of the windows in the home showed evidence of forced entry or exit. The screen had been torn off and the sliding window was open.

Mrs. Wilder's purse was found in the home but contained no money. The body was found on Saturday, 16 August 1980. Mrs. Wilder's daughter testified that she went grocery shopping with Mrs. Wilder every Sunday, and Mrs. Wilder customarily paid for her groceries in cash. She usually spent from $20.00 to $25.00 on such occasions. When Mrs. Wilder's body was found, she was still wearing her rings.

A diary written and kept by the deceased was found in the home. The diary contained an entry in her hand indicating that she made the entry on the morning of 16 August 1980. Friends and relatives tried to contact Mrs. Wilder after 9:00 a.m. on that morning and received no response. Her body was discovered at approximately 6:00 p.m.

Sometime on or before 2 September 1980, Detective Lee Warren of the Asheville Police Department received information leading him to consider the defendant as a possible suspect in the murder of Mrs. Wilder. He left a note at the home of the defendant's grandmother on 2 September 1980 and indicated that he would like to talk to the defendant. The defendant's grandmother lived two houses away from Mrs. Wilder's home.

Sometime prior to 5:55 p.m. on 4 September 1980, the defendant came into the Asheville Police Department and asked for Detective Warren. Detective Warren was contacted by radio and came into the detective offices of the police department to talk to the defendant. Having given the defendant the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), Detective Warren questioned him about the murder of Mrs. Wilder. The defendant claimed no knowledge of the crime. The defendant agreed to take a polygraph examination but, once inside the polygraph room and informed of the questions to be asked, declined to take the test.

Detective Warren offered the defendant a ride home at approximately 8:00 p.m. which the defendant accepted. Detective

Warren asked the defendant if he would return to the police station at 10:00 p.m. The defendant indicated that he would.

That evening the defendant was again given his *Miranda* warnings in the police station and confessed to the murder of Mrs. Wilder. The facts surrounding this confession will be discussed in greater detail at a later point in this opinion. The defendant stated that he went to his grandmother's home on 16 August 1980. After staying there for a short while, he went to an abandoned house and drank liquor. He returned past Mrs. Wilder's home and decided to break into her house. He knocked at the front and back door and received no answer. He then went to a window of the house, took out the screen and went inside. When he entered Mrs. Wilder's house, her dog began barking and attempted to bite him. He kicked the dog. Mrs. Wilder, who had apparently been in the house all the time, hit the defendant and he hit her back. She fell. The defendant picked Mrs. Wilder up and took her to her bed. He placed her on the bed, then went to the kitchen and got a knife. When he returned to the bedroom, Mrs. Wilder was regaining consciousness. He began stabbing her. After stabbing Mrs. Wilder, the defendant wrapped the knife in a towel and went out the back window. He threw the knife in a garbage can, but later retrieved it and threw it in a river when he saw the police at Mrs. Wilder's home.

Kenneth S. Fritz testified tht he lived near the deceased and arrived home at approximately 7:45 p.m. on 16 August 1980. He observed activity around Mrs. Wilder's home at that time and saw and spoke to the defendant. The defendant told him that Mrs. Wilder had been murdered and that she had been stabbed eight times. The defendant told Fritz that he had not discussed the murder with anyone. Mrs. Frances Barbour testified that she also had seen the defendant at the home of the deceased from about 7:15 p.m. to 9:00 p.m.

During the course of the trial, the defendant overpowered a law enforcement officer who was opening his cell door, took the officer's pistol from him and escaped. He was recaptured a short time later.

Based upon the foregoing evidence, the jury found the defendant guilty of premeditated murder in the first degree. During

the sentencing phase, the jury recommended a sentence of life imprisonment. The trial court entered the sentence recommended.

The defendant assigns as error the admission into evidence of his confession to the crime charged. In support of this assignment, he contends that the confession was taken in a manner violative of several of his constitutional rights.

During the trial, and in response to a pretrial motion to suppress by the defendant, the trial court conducted a *voir dire* hearing on the admissibility of the defendant's confession. At that time the trial court heard the testimony of three police detectives, Lee Warren, Bill Dayton and Walt E. Robertson. Their testimony for the State tended to show that Officer Warren left a business card containing his name and title with the defendant's grandmother at her home on 2 September 1980 and asked her to have the defendant contact him. Two days later, on 4 September 1980, the defendant came into the detective office of the Asheville Police Department. Officer Warren was not present in the office at that time but was informed by radio that someone was waiting in the office to see him. He returned to the office at approximately 5:45 p.m. and found the defendant waiting for him.

At approximately 5:55 p.m. on 4 September 1980 the defendant was given the *Miranda* warnings and signed a written waiver of his rights. At that time he also indicated orally that he did not wish to have an attorney present during questioning and that he was prepared to answer questions.

The defendant was questioned concerning the murder of Mrs. Wilder and made an exculpatory statement. This interview took place in a carpeted, well-lighted and air conditioned office which was approximately 14' x 14' in size. During the questioning the defendant was given a soft drink on at least one occasion. During this visit to the detective offices, the defendant was given the opportunity to take a polygraph examination. He indicated he would take the examination. He and Detective Warren then went to the polygraph room in the police station, where Detective Warren prepared the machine and formulated the questions to be asked of the defendant. The defendant asked what questions were to be asked of him, and Detective Warren read or showed them to him. The defendant then stated that he was not going to take the polygraph examination. After the defendant declined to take the

polygraph examination, he was offered and given a ride home by the detective a little after 7:00 p.m. The entire time involved in the defendant's first contact with the detectives was from two hours and ten minutes to two and one half hours.

When the officers took the defendant home, they indicated to him that they would like to meet with him again at 10:00 p.m. that evening. The defendant agreed to meet the detectives at the appointed time, and the detectives went to a restaurant for the evening meal. At approximately 10:00 p.m. the detectives were preparing to return to the office and called to determine whether the defendant had arrived there. They were informed that he had not. They drove through the general area of his residence to see if he was already walking toward the detective offices and to offer him a ride if he was. On their way to their offices, the detectives saw the defendant and asked him if he wanted a ride. He got into the car with the three officers at approximately 10:05 p.m. The group then proceeded to the detective offices. During the ride to the offices, Detective Robertson discussed the defendant's "curly kit" or "jelly curl" which is apparently a hairstyle. Detective Robertson complimented the defendant on his hairstyle, said he had been considering having his hair styled similarly and inquired as to who "put it in for him." The two men also discussed mutual friends and made other small talk. The criminal investigation was not mentioned during the ride to the offices.

Upon reaching the police station, the defendant was taken to a carpeted air conditioned room approximately 24' x 12' in size. He was again advised of his *Miranda* rights both orally and in writing. He executed a second written waiver of rights at approximately 10:14 p.m. He also affirmatively indicated orally that he wished to proceed to answer questions without an attorney present. One of the officers began to question him about the crime under investigation. Detective Robertson or Detective Warren placed before the defendant several photographs of the crime scene including photographs of the body of the deceased. The defendant indicated he did not wish to discuss the case and stated he could not look at the photographs. He began to cry and turned the photographs near him face down or pushed them away. The defendant asked to go to a bathroom. Detective Robertson took him to a nearby bathroom and they then returned to the conference room.

When they returned the defendant took the same seat at the table. The photographs were still where he had left them. At this time the defendant began to cry and stated that whenever he tried to sleep, all he could see was Mrs. Wilder's face and that he had not been able to sleep since it happened. He stated that, "I need to talk to somebody about this." Detective Robertson then told the defendant, "Well, James, you can talk to us about it." The defendant then made the oral confession previously outlined in this opinion. At some point during this latter exchange the defendant again asked to go to the bathroom and again was taken by Detective Robertson. He was also given a soft drink.

Detective Warren testified that he handed the defendant the *Miranda* rights waiver he had already signed to read again just before the defendant made his confession. The defendant looked at it and appeared to read it, but did not read the document aloud.

After the defendant gave his oral confession to the detectives, a stenographer was called at her home and came to the detective offices in the police department. The defendant repeated his confession to the stenographer who reduced it to writing. The defendant signed the written confession.

The defendant offered no evidence during the *voir dire* hearing. At the conclusion of the hearing on *voir dire*, the trial court made findings of fact and conclusions of law and admitted evidence relating to the defendant's confession.

[1] By his first assignment of error, the defendant contends that his station house confession was coerced and was taken in violation of his right to due process of law and to be free from self-incrimination. The defendant readily concedes that he was twice given the *Miranda* warnings and signed a waiver of his rights on both occasions. He does not contend that the warnings were either absent or inadequate. Instead, he contends that he was not heeded when he stated that he did not want to talk about the case under investigation and that any statement taken after he expressed this desire to the officers was a product of compulsion and involuntary as a matter of law. In the context of the case before us, we do not agree with the defendant's contention.

In support of this contention the defendant points out the statement in *Miranda v. Arizona*, 384 U.S. 436, 473-74, 16 L.Ed. 2d 694, 723, 86 S.Ct. 1602, 1627-28 (1966) that:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

The narrow issue before the Court in *Miranda*, however, was precisely stated as "the admissibility of statements obtained from an individual who is subjected to custodial police interrogation." *Id.* at 439, 16 L.Ed. 2d at 704, 86 S.Ct. at 1609; *State v. Martin*, 294 N.C. 702, 242 S.E. 2d 762 (1978). The Court also stated in the opinion that: "The constitutional issue we decide . . . is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 445, 16 L.Ed. 2d at 707, 86 S.Ct. at 1612.

In more recent cases, the Supreme Court of the United States has specifically rejected arguments that the principles of *Miranda* should be extended to cover interrogation in noncustodial circumstances after a police investigation has focused on the suspect and has stated that such arguments go "far beyond the reasons for that holding and such an extension of the *Miranda* requirements would cut this Court's holding in that case completely loose from its own explicitly stated rationale." *Beckwith v. United States*, 425 U.S. 341, 345, 48 L.Ed. 2d 1, 7, 96 S.Ct. 1612, 1615 (1976). The Court in Beckwith rejected the petitioner's argument that he was "interrogated" by Internal Revenue Service agents in surroundings where, as in the case of a subject in custody, the practical compulsion to respond to questions about his tax returns was comparable to the psychological pressures described in *Miranda*. In rejecting his argument that he was placed in a setting which was the functional equivalent of the setting in *Miranda* and that he should have been given the *Miranda* warnings, the Court found that although the focus of an investiga-

tion may indeed have been on Beckwith at the time of the inter-view in the sense that it was his tax liability which was under scrutiny, *Miranda* specifically defined "focus" for its purposes as questioning initiated by law enforcement officers when the suspect is in custody or has been otherwise deprived of his freedom of action in any significant way. *Id.*, at 347, 48 L.Ed. 2d at 8, 96 S.Ct. at 1616.

From the foregoing authorities, it readily can be seen that the warnings required by *Miranda* need only be given to an in-dividual who is subjected to custodial police interrogation. "Inter-rogation," for purposes of invoking the *Miranda* requirements, only occurs when a defendant is in custody, as "[t]he concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'sub-jugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 299, 64 L.Ed. 2d 297, 306, 100 S.Ct. 1682, 1688 (1980). Additionally, the "interrogation" which brings into play the requirements of *Miranda*, "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 64 L.Ed. 2d at 307, 100 S.Ct. at 1689. Thus, if it be concluded that a defendant was not "in custody" at the time of questioning, a reviewing court need not consider whether he was subjected either to express questioning or its equivalent, as such considerations come into play only for the purpose of determining whether a person has been "interrogated" after it has been con-cluded that he was "in custody" at the crucial time. If it be deter-mined that he was not in custody, then it may be concluded *ipso facto* that he was not interrogated for *Miranda* purposes, and the reviewing court is not required to consider whether the respond-ent waived his rights under *Miranda*. His confession will be ad-missible without regard to whether he waived those rights. *Id.* at 298 n. 2, 64 L.Ed. 2d at 306 n. 2, 100 S.Ct. at 1688 n. 2.

Our analysis requires that we now consider whether the defendant was in custody or otherwise deprived of his freedom of action in any significant way at the time he confessed to the crime charged. Both the State and the defendant readily conceded that in the present case there was no probable cause to arrest the defendant or take him into custody prior to his confession. Fur-ther, the uncontroverted evidence clearly indicates that, had the

defendant chosen to get up and leave the detective offices at the time he gave his confession rather than stay and make that confession, no effort would have been made to stop him.

In determining whether a defendant is "in custody" for *Miranda* purposes, however, the reviewing court may rely upon neither the subjective intent of the police to restrain him nor the subjective belief of the defendant as to what the police would do if he attempted to leave. Instead, the reviewing court must determine whether the suspect was in custody based upon an objective test of whether a reasonable person in the suspect's position would believe that he had been taken into custody or otherwise deprived of his freedom of action in any significant way or, to the contrary, would believe that he was free to go at will. *See United States v. Mendenhall*, 446 U.S. 544, 554, 64 L.Ed. 2d 497, 509, 100 S.Ct. 1870, 1877 (1980).

With these rules in mind we review the record before us. The trial court's findings of fact after a *voir dire* hearing concerning the admissibility of the confession are conclusive and binding on the appellate courts when supported by competent evidence. *State v. Jenkins*, 292 N.C. 179, 232 S.E. 2d 648 (1977). In the present case, the trial court heard the uncontroverted evidence of the State on *voir dire*, a part of which has been previously set forth herein. Based upon this evidence, the trial court made the following findings and conclusions:

> That Myrtle Wilson Wilder was killed in her home on August 16, 1980, and was discovered in the late afternoon or early evening hours of that date as having died from multiple stab wounds; that an immediate effort was made on the part of law enforcement officers to determine who might be responsible for the death; and on September 4, 1980, after Officer Warren had left a card with the Defendant's grandmother and requested that he come by to discuss the matter —with the Defendant's grandmother on September 2, 1980, requesting that he come by and discuss the matter, the Defendant did in fact arrive at the Asheville Police Station and was seen by Officer Warren and Officer Dayton shortly before 6:00 p.m. That at that time he was not in custody, was advised that the officers wished to discuss with him the killing of Mrs. Wilder, and the Defendant was read his rights as

follows: 'Before we ask you any questions, you must under-
stand your rights. You have a right to remain silent and not
to make any statement. Anything you say can and will be
used against you in Court. You have the right to talk to a
lawyer and have him present while you are being questioned.
If you cannot afford a lawyer, you have the right to request
the Court to appoint one for you before you answer ques-
tions. If you decide to answer questions now without a
lawyer present, you will have the right to stop answering at
any time. You also have the right to stop answering at any
time until you talk to a lawyer.' That immediately following
the rights appears a Waiver of Rights, reading as follows: 'I
have read this statement of my rights, and I understand
what my rights are. I am willing to make a statement and
answer questions. I do not want a lawyer at this time. I
understand and know what I am doing. No promises or
threats have been made to me, and no pressure or coercion of
any kind has been used against me by anyone.' That after the
rights and waiver of rights were read to the Defendant, he
was asked to read and sign the Waiver, read the Rights and
Waiver form and sign the Waiver, if he understood his
rights. That he did in fact sign the Waiver of Rights, and his
signature was witnessed by Officer Dayton, the time being
approximately 5:56 p.m.

That at that time, in response to questions from the of-
ficers, he stated that he had known Mrs. Wilder for about 10
years, and at one time was a piano student of hers, and had
last seen her as he walked out of her drive, at which time she
addressed him indicating that she thought he was in Florida.
That sometime before that he had been in her home and
helped move boxes for her, but that he knew nothing about
her murder; that he was then advised by Officer Warren that
he would like to question the Defendant later that evening
around 10:00 o'clock. That he was then taken back to his
residence in Asheville.

That at one point prior to being taken back to his
residence and after having denied any knowledge of the
murder about which he was being questioned, he was offered
a Polygraph test, which he agreed to take. That he was in
the Polygraph room while the machine was being prepared

for use during the test, and at that time asked Officer Warren what questions would be asked of him. That when he was advised by Officer Warren what questions would be asked, he declined to take the test, and that it was following this refusal that he was taken home; that throughout this initial period he did not have any odor of alcohol about his person, he did not appear to be under the influence of any alcohol or drugs, his answers to questions asked were responsive, and while nervous and depressed, there was nothing to indicate that he did not know and understand the purpose of his being at the police station or the rights about which he had been advised.

That thereafter during the early evening hours, Officer Dayton, Robertson and Warren had dinner, after which a call was made to determine whether or not the Defendant had returned to the Police Station around 10:00 o'clock. Learning that he had not, the officers drove to the area of the Defendant's home; that he came out of his or someone's apartment, came to the police cruiser, and on being asked if he wanted a ride, got in the cruiser. That on the way to the Police Station no one discussed the case with him, and he was not asked any questions concerning the case, and he was not placed under arrest.

That after getting to the Police Station around 10:00 o'clock, he was again advised of his rights and signed a Waiver of Rights, after having same read to him and tendered for his reading. That this Rights Waiver was witnessed by Officers Dayton and Robertson. That the first warning concerning his rights has been offered and admitted into evidence as State's Exhibit 16, and the second as State's Exhibit 17. That the Defendant knowingly, willingly and understanding and voluntarily signed both Rights Waiver forms, after having full knowledge and understanding of his rights, and at all times fully cooperated with the officers. That after signing the second Rights Waiver and when the officers began discussing the case with him, he first stated that he did not want to talk about the case, but was taken to the restroom at his request, returned, and after looking at some pictures of the deceased, he stated that he had trouble sleeping, that he could only see Mrs. Wilder's face, and he

needed to talk to someone about what happened. That on being told by Officer Robertson that he could talk to the officers about what happened, he gave a complete detailed statement of what occurred, said statement being offered and admitted into evidence as State's Exhibit 18.

That it was only after the statement was given that a Warrant was obtained and the Defendant was taken to the Magistrate's Office, that the Defendant was placed under arrest. That he was at no time promised anything or threatened in any way. That on both occasions his answers to questions asked were responsive, and the statement made about what occurred was largely made on Defendant's own part, with very few if any questions being asked. That no promise or threat of any kind was ever made to the Defendant; that no food nor drink was ever denied to the Defendant; that the Defendant never indicated any desire to stop talking during the questioning and never made any request for an attorney or indicated in any way that he did not fully understand his rights, and so indicated affirmatively that he did by signing two Rights Waiver forms. That the statement given in final form was as given by him and taken by Mrs. Stover and indicates an articulate, understandable, comprehensive version of events discussed in detail and in an intelligent manner; that while the Defendant was nervous and depressed, there was nothing to indicate that he was confused or incoherent. His physical condition was good. He seemed to understand the questions asked and responded appropriately and never complained of any problem, mental or physical. That there is absolutely no evidence of any threats, suggestion of violence or show of violence by law enforcement officers to induce the Defendant to make a statement; and that, in fact, all of the evidence is to the contrary; that when the Defendant asked for a Coke, he received one. When he wanted to go to the bathroom, he was permitted to go; and the interrogation occurred in a well lighted, well appointed, air conditioned room.

That the age and educational background of the Defendant has not been given, but that he appears to the Court from personal observation to be a young adult black male of better than average intelligence and in good physical condition at this time, and according to the officers, in good mental

and physical condition at the time of the questioning. That although the Defendant became extremely nervous, upset, and cried on at least two occasions as he related the events that took place on the morning of the 16th of August, 1980, he clearly was not confused, remained coherent, understood what he was doing and saying, and gave a detailed, believable account of the incidents occurring on the morning of 16 August, 1980. That Defendant knew at all times during questioning that he was a suspect in the case involving a murder—the murder of Myrtle Wilson Wilder, understood that this could be—could result in a first degree murder charge and a possible death verdict.

That the initial interrogation involving possible taking of a Polygraph involved approximately two hours to two-and-a-half hours, and the second interrogation and statement lasted for an even lesser time, as will be revealed by the record.

Based upon the foregoing findings of fact, the Court concludes as a matter of law that there was no offer of hope, reward or inducement to the Defendant to make a statement; that there was no threat or suggestion of violence or show of violence to persuade or induce the Defendant to make a statement; that the statement made by the Defendant—that both statements made by the Defendant on September 4, 1980 were made voluntarily, knowingly, understandingly and independently; that the Defendant was in full understanding of his Constitutional Rights to remain silent and right to counsel and all other rights on both occasions, and so indicated by signing Waiver of Rights forms, as will appear of record; and that he purposely, freely, knowingly and voluntarily waived each of those rights and thereupon made statements to the officers above mentioned.

The defendant quite correctly points out in his brief that the trial court found as a fact that the defendant was not in custody on the first occasion during which he was questioned in the detective offices and that the trial court failed to make any conclusion as to whether the defendant was in custody during the second and crucial period of questioning. The determination whether an individual is "in custody" during an interrogation so as to invoke the requirements of *Miranda* requires an application of fixed rules

of law and results in a conclusion of law and not a finding of fact. To the extent that our prior opinion in *State v. Clay*, 297 N.C. 555, 256 S.E. 2d 176 (1979) may be taken as indicating that this determination is a finding of fact, that case is disapproved.

The defendant further contends, and we agree, that these circumstances do not prevent us from determining the admissibility of the defendant's confession in the present case. Since the legal significance of the findings of fact made by the trial court is a question of law, these findings are sufficient to allow us to resolve the issue presented. *See State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981). Further, where the historical facts are uncontroverted and clearly reflected in the record, as in the present case, we may review the trial court's ruling on the admissibility of a confession in the absence of complete findings of fact and conclusions of law and even in the absence of a ruling by the trial court on the admissibility of the confession. *See State v. Pearce*, 266 N.C. 234, 145 S.E. 2d 918 (1966).

It is clear that the trial court's findings were amply supported by the uncontroverted testimony presented on *voir dire* and previously set forth in part herein. Those findings are, therefore, binding upon us on this appeal. When viewed either in light of the facts found by the trial court or independently in light of the uncontroverted evidence offered on *voir dire*, it is apparent that the defendant was not taken into custody or otherwise deprived of his freedom of action in any significant way until after he had confessed to the murder in question.

The uncontroverted evidence reveals that the defendant initially came to the detective offices voluntarily and unescorted in response to a request left with his grandmother two days previously. At that time he was asked questions concerning the murder under investigation and made an exculpatory statement. This interview took place in comfortable surroundings in which the defendant was given soft drinks and in no way deprived of any physical necessities. During this first visit to the detective offices on 4 September 1980, the defendant was offered a polygraph examination. He agreed to take the test. Upon asking and being told what questions he would be asked in the course of the polygraph examination, the defendant stated that he would not take the polygraph examination. The defendant thus terminated

the interview, was allowed to leave at will and was given a ride home. Nothing in the conduct of the law enforcement officers during the first interview of the defendant would have indicated to a reasonable person in the defendant's position that he had been taken into custody or otherwise deprived of his freedom of action in any way significant or otherwise. *See Oregon v. Mathiason,* 429 U.S. 492, 50 L.Ed. 2d 714, 97 S.Ct. 711 (1977) (per curiam). To the contrary, every indication given the defendant was to the effect that he could terminate the questioning by leaving at any time. He in fact exercised this freedom by stating that he was not going to take the polygraph test and by leaving the police station.

The uncontroverted testimony on *voir dire* further reveals that the officers asked to see the defendant at the detective offices again at approximately 10:00 p.m. on the evening of 4 September 1980. The defendant agreed to meet with them at that time. After the officers had eaten their evening meal they called their office to determine whether the defendant had arrived. Having determined that the defendant had not yet arrived at their offices, the officers drove through his neighborhood to see if he was walking in that direction. They did not know at that time precisely which house or apartment the defendant lived in but were familiar with the general neighborhood in which he lived. During their drive through the neighborhood, the officers saw the defendant and offered him a ride to the offices. He got into the car with them and they proceeded to the detective offices. The defendant was again interviewed in comfortable circumstances and his physical needs were cared for. When he wanted a soft drink he was given one. When he wanted to go to the bathroom he was allowed to go.

The defendant emphasizes that on the two occasions he went to the bathroom during the second period of questioning he was accompanied by Detective Robertson. He contends that this would have caused a reasonable person in his position to believe that he was not free to go at will. We do not think that this fact can be viewed in isolation so as to mandate the conclusion that the defendant was in custody or otherwise deprived of his freedom in any significant way.

The record before us is silent as to the specific reason for which Detective Robertson accompanied the defendant to the

bathroom. The record does indicate that this questioning occurred in the evening hours after most of the doors to the police station had been locked. We are unable to ascertain from the record, however, whether Detective Robertson was required to unlock any doors in order to allow the defendant to use the bathroom. At least on the initial trip to the bathroom, it is as reasonable to believe that Detective Robertson was simply showing the defendant where the bathroom was as to believe that his presence was intended or acted as any restraint upon the defendant. In the context of this record, the reason Detective Robertson accompanied the defendant to the bathroom simply cannot be determined. In any event, when the fact relied upon by the defendant is viewed together with the other indicia upon which a reasonable person in his position would have formed a belief, we think it was insufficient to support the conclusion that a reasonable person would have believed that he was other than free to go at will. Our conclusion that a reasonable person in the defendant's position would have believed he was free to go at will is buttressed by the fact that on the same day and under very nearly identical circumstances, the defendant had in fact exercised his right to terminate questioning by the simple expedient of saying no and leaving the detective offices.

Similarly, we do not think that in the context of these facts the failure specifically to advise the defendant during either the first or second periods of questioning that he was free to go at any time would have indicated to a reasonable person in the defendant's circumstances that he was not free to go at will. The defendant once exercised his right to leave, and we do not believe the conduct of the officers during the second period of questioning differed from that employed during the first period of questioning in any manner so substantial as to indicate to a reasonable person that there had been any significant change in his status which would deprive him of his freedom of action in any way. We conclude that the defendant was not in custody or deprived of his freedom of action in any significant way and that *Miranda* is not applicable.

As we have indicated, *Miranda* was designed to provide an effective method by which a suspect could exercise his Fifth Amendment privilege to be free from answering questions when he was in custody and had no other manner in which to exercise

this privilege. *Miranda's* commandment that questioning cease when a suspect indicates he intends to exercise his Fifth Amendment privilege does not apply, however, in situations such as this where the defendant has available the easier and more effective method of invoking the privilege simply by leaving. Neither *Miranda* nor *Michigan v. Mosely*, 423 U.S. 96, 46 L.Ed. 2d 313, 96 S.Ct. 321 (1975), also relied upon by the defendant on this point, requires any such result. Nothing in the Constitution prevents a policeman from addressing questions to anyone not in custody or deprived of his freedom of action in any significant way. *See United States v. Mendenhall*, 446 U.S. 544, 64 L.Ed. 2d 497, 100 S.Ct. 1870 (1980). Law enforcement officers enjoy the same liberty as every other citizen to address questions to other persons. When those persons are not in custody or deprived of their freedom of action in any significant way, they have an equal right to ignore such questions and walk away and do not need the protection of *Miranda*. *Id*. The defendant in the present case was one of the class of people entitled to walk away rather than answer questions and was not in need of or entitled to the protections of *Miranda*.

Additionally, strong considerations of public policy convince us that we should not adopt the defendant's position that, once *Miranda* warnings have been given unnecessarily to a defendant who has not been subjected to custodial interrogation, the requirements of *Miranda* apply with full force as though he had been subjected to custodial interrogation. We fear that to do so would, in many cases, discourage officers from giving the *Miranda* warnings where the issue of custody of the suspect was close. We would not wish to cause any such result.

Our review of the defendant's assignment of error and contentions raises another issue not specifically articulated therein. Although we are not required to consider an issue not squarely presented by an assignment of error, due consideration for the proper administration of justice leads us to conclude that the defendant's assignment here presents the contention that his confession was obtained as the result of an unconstitutional seizure of his person in violation of the Fourth and Fourteenth Amendments. Although a confession "may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis

. . . . Indeed, if the Fifth Amendment has been violated the Fourth Amendment issue would not have to be reached." *Dunaway v. New York*, 442 U.S. 200, 217, 60 L.Ed. 2d 824, 839, 99 S.Ct. 2248, 2259 (1979). The test to be employed in determining whether a person is "seized" for purposes of the Fourth Amendment has been specifically set forth by the Supreme Court of the United States as follows:

> We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554, 64 L.Ed. 2d 497, 509, 100 S.Ct. 1870, 1877 (1980) (citations omitted). There is no foundation whatsoever for invoking Fourth Amendment safeguards absent such restraint. *Id.* The same facts which lead us to conclude that the defendant was not taken into custody or otherwise deprived of his freedom of action in any significant way for purposes of the Fifth Amendment lead us to conclude that the defendant was not restrained in such manner as to amount to being seized for purposes of Fourth Amendment analysis. *See Dunaway v. New York*, 442 U.S. 200, 60 L.Ed. 2d 824, 99 S.Ct. 2248 (1979); *State v. Simpson*, 303 N.C. 439, 279 S.E. 2d 542 (1981); *and, State v. Reynolds*, 298 N.C. 380, 259 S.E. 2d 843 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 795, 100 S.Ct. 2164 (1980).

The ultimate test of the admissibility of a confession is whether the statement was in fact voluntarily and understandingly made. *State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976). This remains true despite the fact that in a particular case there has been compliance with the procedural requirements of the Fourth and Fifth Amendments. Such procedural compliance standing alone will not necessarily suffice in all cases. It remains for us to make an independent determination of the ultimate issue of volun-

tariness based upon our examination and consideration of the entire record on appeal. *Beckwith v. United States*, 425 U.S. 341, 48 L.Ed. 2d 1, 96 S.Ct. 1612 (1976); *Davis v. North Carolina*, 384 U.S. 737, 16 L.Ed. 2d 895, 86 S.Ct. 1761 (1966); *State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976). Our review of the entire record leads us to conclude that the trial court's findings were supported by competent and uncontroverted evidence. Those findings in turn support the trial court's conclusion that the defendant's confession was voluntarily, knowingly, understandingly and independently made with full understanding of his constitutional rights. We agree and concur in the trial court's conclusion and find that the admission of the defendant's confession into evidence was free of prejudicial error.

[2] The defendant next assigns as error the action of the trial court in admitting into evidence the diary of the deceased and contends that this deprived him of his right under the Sixth and Fourteenth Amendments to confront the witnesses against him. The last entry in Mrs. Wilder's diary on the page offered into evidence was "Johnny came about 3:30 this a.m. I let him and went back to sleep. He left at 7:15 p.m. I guess breakfast begins at 7:30 on Saturday. I got up at 8:15. Going to be another hot day." Indications in the diary were to the effect that this entry was made on 16 August 1980. The "Johnny" referred to in the diary entry was apparently the grandson of the deceased who lived with her. The diary entry was offered into evidence by the State for the purpose of tending to show that the deceased was still alive at 8:15 a.m. on the day her body was found.

Assuming *arguendo* that the diary entry was offered to prove the matters asserted therein, we find it to be hearsay evidence exceptionally admissible. "The twofold basis for exceptions to the rule excluding hearsay evidence is necessity and a reasonable probability of truthfulness." *State v. Vestal*, 278 N.C. 561, 582, 180 S.E. 2d 755, 769 (1971), *cert. denied*, 414 U.S. 874, 38 L.Ed. 2d 114, 94 S.Ct. 157 (1973). The death of Mrs. Wilder established necessity as she was the declarant and unavailable as a witness. *Id.* We think that the reasonable probability of truthfulness of the diary entry is clear. It is obvious that Mrs. Wilder had to be alive in order to make the entry in her diary, and there is simply no reason whatsoever to believe that a woman would lie in her personal diary about a matter so mun-

dane as the time at which she got out of bed. This evidence was properly admitted.

The defendant's real complaint concerning the introduction of the diary entry seems to be that it saved the State the necessity of calling Johnny Randolph, the grandson of the deceased, to testify that he saw his grandmother alive on the morning she was murdered and denied the defendant the opportunity to cross-examine Randolph in an attempt to show that he too should have been a suspect. The failure to call Randolph was not relevant to the admissibility of the evidence in question. He did not make the diary entry and presumably was not competent to testify as to most of its contents. If the defendant wished to examine Randolph, the defendant had an opportunity equal to that of the State to call him as a witness and examine him as thoroughly as desired. But the failure of the State to call Randolph as a witness simply has no relevance to the issue of the admissibility of the diary entry. This assignment of error is without merit.

[3] The defendant next assigns as error comments made by the prosecutor in his closing argument to the jury which the defendant contends were grossly improper expressions of personal opinion concerning matters not in evidence. The assignment of error is directed to the following portion of the prosecutor's closing argument to the jury:

> You know, this case is completely uncontroverted. The facts in this case are completely uncontroverted. When I took this job over two years ago, I came into this Courtroom, put my hand on this Bible right over there, and I took an oath that I would see that justice was done in this county. Every one of these officers in this courtroom are sworn law enforcement officers. Ladies and gentlemen, we have brought the truth into this courtroom. I ask, who is being honest with you? Who is being honest with you.

The defendant did not object to this portion of the prosecutor's closing argument to the jury and did not take an exception to it before the jury rendered its verdict. When counsel makes an improper remark in arguing to the jury, an exception must be taken before the verdict or the impropriety is waived. *State v. Morgan,* 299 N.C. 191, 261 S.E. 2d 827, *cert. denied,* 446 U.S. 986, 64 L.Ed. 2d 844, 100 S.Ct. 2971 (1980). But when a prosecutor's comments

stray so far from the bounds of propriety as to impede the defendant's right to a fair trial, the trial court has the duty to act *ex mero motu. Id.* Our examination of the record in the present case leads us to conclude that the quoted portion of the argument of the prosecutor did not stray so far from the bounds of propriety as to require action by the trial court *ex mero motu.*

Even had the argument of the prosecutor been properly objected to and a timely exception taken, the remarks complained of were not so prejudicial as to require a new trial. The record clearly reveals that defense counsel in his argument to the jury attacked the credibility of the law enforcement officers testifying in the case and made veiled implications that evidence was being withheld. In the portion of the prosecutor's argument to which the assignment of error is directed, the prosecutor merely attempted to respond to defense counsel and to defend the performance of the investigating officers and the manner in which the State presented its case. This response by the prosecutor to the arguments of the defendant's attorney was justified. *State v. McCall,* 289 N.C. 512, 223 S.E. 2d 303, *death penalty vacated,* 429 U.S. 912, 50 L.Ed. 2d 278, 97 S.Ct. 301 (1976).

[4] The defendant next assigns as error the failure of the trial court to instruct the jury that they could return a verdict of felony murder in the second degree. We conclude that the law of this jurisdiction recognizes no offense of felony murder in the second degree. The failure to instruct the jury on this theory was correct.

Prior to 1893 any intentional and unlawful killing of a human being with malice aforethought, express or implied, constituted murder punishable by death. *State v. Rhyne,* 124 N.C. 847, 33 S.E. 128 (1899); *State v. Boon,* 1 N.C. (Tay.) 191. In 1893 the General Assembly adopted 1893 N.C. Pub. Laws ch. 85, the terms of which are now embodied in G.S. 14-17, dividing murder into two degrees. From that day to the present, this statute has not given any new definition of murder, but permits that to remain as it was at common law. *State v. Streeton,* 231 N.C. 301, 56 S.E. 2d 649 (1949). The statute merely selects from all murders denounced by the common law those deemed most heinous by reason of the mode of their perpetration and classifies them as murder in the first degree, for which a greater punishment is prescribed. *Id.*

Any other intentional and unlawful killing of a human being with malice aforethought, express or implied, remains murder as at common law, but is classified by the statute as murder in the second degree and a lesser sentence is prescribed. *State v. Smith*, 221 N.C. 278, 20 S.E. 2d 313 (1942). The murders classified as murder in the first degree by the 1893 enactment were divided into three basic categories: (1) murders perpetrated by means of poison, lying in wait, imprisonment, starving, or torture, (2) premeditated murder, and (3) killings occurring in the commission of certain specified felonies "or other felony." The third category has frequently been referred to as "felony murder" although that term is not used in the statute and we have discouraged its use in issues submitted to juries. *State v. Foster*, 293 N.C. 674, 239 S.E. 2d 449 (1977). This Court construed the phrase "or other felony" employed in the statute to include at least those killings committed during the commission of "any other felony inherently dangerous to life" as murder in the first degree, but we specifically reserved for a later time any opinion as to whether the words "or other felony" included any statutory felony not inherently dangerous to life. *State v. Streeton*, 231 N.C. 301, 305, 56 S.E. 2d 649, 652 (1949).

In 1977 the General Assembly, in apparent response to holdings such as in *Streeton*, amended the statute to substitute for the phrase "or other felony" the phrase "or other felony committed or attempted with the use of a deadly weapon." 1977 N.C. Sess. Laws, ch. 406. As a result of the 1977 amendment, our holdings interpreting the former phrase "or other felony" as including those killings committed during the commission of felonies inherently dangerous to life retain validity only with regard to murders committed prior to the amendment's effective date of 1 June 1977 and should be disregarded on this point in cases involving murders committed after that date. *E.g., State v. Foster*, 293 N.C. 674, 239 S.E. 2d 449 (1977); *State v. Shrader*, 290 N.C. 253, 225 S.E. 2d 522 (1976); *State v. Woods*, 286 N.C. 612, 213 S.E. 2d 214 (1975), *death penalty vacated*, 428 U.S. 903, 49 L.Ed. 2d 1208, 96 S.Ct. 3207 (1976); *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972); *State v. Maynard*, 247 N.C. 462, 101 S.E. 2d 340 (1958); *State v. Streeton*, 231 N.C. 301, 56 S.E. 2d 649 (1949). From the effective date of the 1977 amendment, a killing occurring during the commission of a felony not specified in the statute is

murder in the first degree only if the felony was committed or attempted with the use of a deadly weapon.

The statute, including the 1977 and subsequent amendments now states in its entirety:

§ 14.17. Murder in the first and second degree defined; punishment.—

A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree, and any person who commits such murder shall be punished with death or imprisonment in the State's prison for life as the court shall determine pursuant to G.S. 15A-2000. All other kinds of murder, including that which shall be proximately caused by the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium when the ingestion of such substance causes the death of the user, shall be deemed murder in the second degree, and any person who commits such murder shall be punished as a Class C felon.

As can readily be seen from the face of the statute, murders commonly referred to as "felony murders" now include killings occurring during the commission or attempted commission of a felony with the use of a deadly weapon and killings occurring during the perpetration or attempted perpetration of the specified felonies of arson, rape or a sex offense, robbery, kidnapping, or burglary, without regard to whether these specified felonies were perpetrated or attempted with the use of a deadly weapon. All such murders are deemed by the statute to be murder in the first degree. Conversely, killings occurring during the commission or attempted commission of a felony *not* committed or attempted with the use of a deadly weapon *and not* one of the felonies specified in the statute are, *nothing else appearing*, not murder in either the first or second degree.

If the State is to carry its burden of proof on a charge of murder in cases in which a killing occurs during the commission

of a felony committed or attempted *without* the use of a deadly weapon *and not* one of the felonies specified in the statute, it must show that the killing was murder as at common law by proof beyond a reasonable doubt that it was an intentional and unlawful killing with malice aforethought. In such cases the State will have borne the burden of proof necessary to sustain a conviction of murder in the second degree. If the State additionally can prove beyond a reasonable doubt that the murder was premeditated and deliberate, it will have borne its burden of proving the offense was murder in the first degree.

The definitions of the terms "malice aforethought" and the terms "premeditation" and "deliberation" as previously applied in this jurisdiction remain unchanged by our holding in this case. *See State v. Benton*, 276 N.C. 641, 174 S.E. 2d 793 (1970). Additionally, our holding today does not affect cases involving deaths arising by means of poison, lying in wait, imprisonment, starving or torture, which continue to the same extent as before to be classified by the statute as murder in the first degree.

We are aware of the fact that the North Carolina Pattern Jury Instructions frequently employed by our trial courts in instructing juries include an instruction relative to "Second Degree Murder in Perpetration of Felony." N.C.P.I.—206.31. As we have indicated that no such crime is a part of the law of this jurisdiction, the proposed instruction should not be used by trial courts.

Perhaps the apparent confusion in interpreting G.S. 14-17 arises from the current wording of the second sentence of the statute. From its enactment in 1893, the second sentence of the statute has stated: "All other kinds of murder shall be deemed murder in the second degree." This sentence of the statute was amended effective 1 July 1980. 1979 N.C. Sess. Laws, ch. 1251 (2nd Sess.). The sentence in pertinent part now states:

> All other kinds of murder, including that which shall be proximately caused by the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium when the ingestion of such substance causes the death of the user, shall be deemed murder in the second degree, . . . .

G.S. 14-17. By including the language relative to murders proximately caused by the distribution of controlled substances in the

sentence declaring "all other kinds of murder" to be classified as murder in the second degree, we do not think the legislature intended to alter the law substantially. Instead, we think the legislature merely reaffirmed its desire that we not expand our former line of holdings interpreting the words "or other felony," as set forth in the first sentence of the statute prior to the 1977 amendment, so as to include within the definition of murder in the first degree those killings occurring during the commission or attempted commission of a felony not specified in the statute and not involving the use of a deadly weapon. We believe that our interpretation of the 1977 amendment addresses the same concern and that the cited amendment of 1979 relative to murders proximately caused by the unlawful distribution of controlled substances was intended to do no more. More specifically, we do not think the legislature intended to create a crime of murder in the second degree arising solely from the fact that a death results from the unlawful distribution of controlled substances without a showing of intent and malice aforethought. In light of our holding today, we construe the second and final sentence of the statute as requiring only that all intentional and unlawful killings with malice aforethought be classified as murder in the second degree, unless they have for one or more reasons been declared murder in the first degree by the express terms of the statute. Thus, in offering evidence of "all other kinds of murder" as that phrase is employed in the second sentence of the statute, the State must bear the burden of proving that the killing was intentional, unlawful and done with malice aforethought, even though it may have been proximately caused by the unlawful distribution of controlled substances or proximately caused by the commission or the attempted commission of any felony not specified in the first sentence of the statute and without the use of a deadly weapon. In other words, the final sentence of the statute merely indicates that all crimes *which were murder at common law* remain murder in the second degree, unless otherwise made murder in the first degree under one of the specific classifications of the statutes.

In the instant case, the trial court properly instructed the jury that it could return a verdict of guilty of murder in the first degree under the theory that the defendant acted with premeditation and deliberation. The trial court also properly instructed the jury that it could return a verdict of guilty of murder in the sec-

ond degree if it found the defendant killed the deceased intentionally and with malice but without premeditation and deliberation. If the jury failed to find the defendant guilty of either first or second-degree murder under these instructions, the trial court properly instructed that the verdict must be not guilty. As we today hold that the law of this jurisdiction recognizes no offense of felony murder in the second degree, the trial court correctly declined to charge on any such theory. The trial court's instructions concerning permissible verdicts were proper, complete and correct.

[5] The defendant's next assignment of error challenges the constitutionality of the following portion of the trial court's instructions to the jury:

> If the State proves beyond a reasonable doubt or it is admitted that the Defendant intentionally killed Myrtle Wilson Wilder with a deadly weapon, or intentionally inflicted a wound upon Mrs. Wilder with a deadly weapon that proximately caused her death, the law implies first that the killing was unlawful, and second, that it was done with malice.

The defendant contends that this portion of the instructions to the jury by the trial court created a conclusive presumption of malice and unlawfulness and denied him the right to trial by jury guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, § 24 of the Constitution of North Carolina. It is sufficient for us to point out that we have previously reviewed instructions to juries in other cases which employed the identical operative language employed in the portion of the instructions complained of here. In those cases we found no constitutional infirmity in instructions employing the identical operative language employed in the previously quoted portion of the instructions in the present case. *State v. Simpson*, 303 N.C. 439, 279 S.E. 2d 542 (1981). *Cf. State v. White*, 300 N.C. 494, 268 S.E. 2d 481 (1980). This assignment of error is overruled.

[6] By his final assignment of error, the defendant contends that the procedure set out in G.S. 15A-2000(a)(2) for death qualifying a jury prior to the guilt phase of a trial and requiring the same jury to hear both the guilty phase of the trial and the penalty phase of the trial is unconstitutional. The defendant additionally contends that it is a violation of equal protection of the laws to deny him

the funds for an expert to testify as to the "guilt proneness" of jurors who are death qualified. It is the defendant's further contention that "death qualifying" the jury prior to the guilt phase of the trial resulted in a guilt-prone jury and denied him the right to a fair trial as guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article I, § 19 of the Constitution of North Carolina. We have previously considered and rejected identical contentions in *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981) and *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1979). This assignment of error is without merit and is overruled.

The defendant received a full and fair trial in the trial court. He has had the further benefit of excellent appellate advocacy before this Court. His trial was free of prejudicial error, and we find

No error.