**STATE v. DUKES**

[110 N.C. App. 695 (1993)]

---

STATE OF NORTH CAROLINA v. SOLOMON DUKES

No. 9212SC518

(Filed 6 July 1993)

**1. Evidence and Witnesses § 1239 (NCI4th) — murder — statement by defendant in his home — custodial interrogation**

A murder defendant was in custody when he made a statement to an officer where defendant was escorted to his trailer by an officer, who remained with him for some time; another officer arrived and was instructed in defendant's presence to stay in the trailer with defendant and not to permit defendant to change or wash his clothing; and that officer remained in the trailer with defendant and accompanied defendant to the bathroom. A reasonable person, knowing that his wife had just been killed, kept under constant police supervision, told not to wash or change his clothing, and never

informed that he was free to leave his own home would not feel free to go and would feel compelled to stay.

**Am Jur 2d, Criminal Law § 788; Evidence § 554.**

2. **Evidence and Witnesses § 1235 (NCI4th)— murder—inquiry into what happened—interrogation**

A murder defendant was subject to interrogation where an officer was told to stay with defendant and ensure that defendant did not wash or change his clothes and the officer asked defendant if he knew what was happening. Although the question may not knowingly have been designed to elicit an incriminating response from defendant, the facts indicate that the officer had enough information to at least question whether defendant was a suspect in a crime and, under these circumstances, it cannot be said that the officer should not have known that his question was reasonably likely to elicit an incriminating response from defendant.

**Am Jur 2d, Criminal Law §§ 788, 793; Evidence §§ 555, 614.**

3. **Evidence and Witnesses § 732 (NCI4th)— murder—defendant's statement—not inculpatory—admission not prejudicial**

A murder defendant's reply to an officer's question was not inculpatory where the officer asked defendant if he knew what was happening and defendant replied that his wife had been hurt and was being taken to the hospital and that the police believed he was responsible. This statement merely represented defendant's opinion as to the suspicions of the police and was not an admission of guilt or a statement from which guilt would necessarily be inferred. Moreover, even if the trial court erred in admitting the statement, other competent evidence pointed overwhelmingly to his culpability.

**Am Jur 2d, Appeal and Error §§ 797, 798, 803.**

4. **Evidence and Witnesses § 1298 (NCI4th)— murder—statement of defendant—waiver of rights—defendant distraught**

A murder defendant's statement to an investigator at a law enforcement center was voluntary where defendant was calm when arrested at 7:27 a.m.; he was placed in an interview room at 7:49 a.m. after being transported to the Law Enforcement Center; he had his head down and was crying and calling his baby's name; an investigator observed defendant lift his

head and say "I stabbed her" while the investigator was advising defendant of his rights; defendant then asked for a cigarette; there were no tears at that time; the investigator stepped out to get matches; the investigator tried to calm defendant at 7:57 a.m. but defendant did not respond; defendant was observed to be asleep at 8:06; the investigator awoke defendant at 8:53 a.m.; defendant was allowed to use the restroom; defendant made a statement at 10:11 a.m.; and the investigator was of the opinion that defendant was playing on his sympathy. The evidence showed that the officer had not asked defendant any questions and was trying to read defendant his rights, as well as calm him down, when defendant confessed.

**Am Jur 2d, Evidence § 575.**

5. **Evidence and Witnesses § 2093 (NCI4th) — murder — testimony that defendant feigning distress — admissible**

The trial judge did not err in a murder prosecution by allowing the State's witnesses to testify that defendant was faking his distress at the scene of his wife's death, in route to the Law Enforcement Center, or at the Law Enforcement Center where each of the witnesses was required to provide foundation testimony which showed that their opinion was based upon their own perception of the defendant's behavior. Furthermore, the testimony was helpful to the jury in characterizing the defendant's behavior immediately following the death of his wife.

**Am Jur 2d, Expert and Opinion Evidence §§ 359, 360.**

Appeal by defendant from judgment entered 22 November 1991 by Judge E. Lynn Johnson in Cumberland County Superior Court. Heard in the Court of Appeals 27 April 1993.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Jeffrey P. Gray, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defenders Teresa A. McHugh and Janine M. Crawley, for defendant-appellant.*

WYNN, Judge.

Defendant, Solomon Dukes, was indicted on 26 March 1990 for second degree murder. Defendant made two pretrial motions

to suppress inculpatory statements made to police officers. Both motions were denied. The case was tried to a jury and the jury returned a verdict of guilty. The trial judge entered judgment on the verdict and sentenced defendant to fifteen years imprisonment.

The State presented the following pertinent evidence at the pretrial hearing on defendant's motions to suppress. Agent Felton Moore, Jr. of the City/County Bureau of Narcotics testified that on 14 January 1990 at around 4:30 a.m., he was dispatched to the Parkwood Circle Trailer Park in Fayetteville, North Carolina to investigate a death. Upon arrival, Agent Moore saw defendant, whom he recognized from previous encounters. Defendant was pacing in circles outside Audrea Dukes' trailer, holding an infant very tightly, and screaming "Oh my baby, Oh my baby." In addition, defendant kept bumping into a parked car and falling to the ground. Several officers were attempting to calm defendant and take the baby from him. Both defendant and the baby had blood on their clothing. After being briefed by Sergeant Robert Belcher, Agent Moore went back outside and spoke to defendant. Defendant recognized Agent Moore and stated that he wanted to go home. Agent Moore accompanied defendant and the infant to defendant's trailer. Agent Moore remained at the defendant's trailer for some period of time during which defendant made a telephone call. Agent Moore asked defendant what happened and defendant stated that he and his friends had just returned from Raeford; that he went to check on his wife and baby; that the lights were off in her trailer when he opened the door; that he heard his baby crying and turned on the lights; and that he found his wife lying on the floor and the baby sitting on the bed. Agent Moore called another officer to come to the trailer and watch the defendant so that Moore could return to the crime scene. Officer James Thompson arrived and Agent Moore told him not to let the defendant leave the trailer and not to allow defendant to wash nor change his, or the baby's clothing.

Officer Thompson testified that after arriving at the victim's trailer, he was immediately instructed to report to Agent Moore at defendant's trailer. He was instructed by Moore to guard the defendant; not to allow defendant to leave the trailer; not to allow any other person to enter the trailer; and not to allow the defendant to wash or change clothes. Officer Thompson stated that defendant moaned and rocked the baby but never cried. Defendant made several telephone calls after obtaining permission to do so from

Officer Thompson. Officer Thompson accompanied defendant to the bathroom to ensure that defendant did not wash or change clothes. Officer Thompson testified that he asked defendant if he knew what was going on and defendant responded that his "girlfriend had been hurt and she was going to the hospital. They were taking the baby from him . . . and that the police [thought] he did it." At that time, Officer Thompson did not know what was going on and did not know that the defendant was a suspect.

In addition to the evidence presented at the suppression hearing, the State's evidence presented at trial tended to show the following. Between 2:30 and 3:00 a.m. on the morning of 14 January 1990, defendant, Marcus Virgil and Audrey Sanders returned from a night club in Raeford, North Carolina to defendant's mobile home located in Parkwood Circle Trailer Park. Defendant told Virgil and Sanders that he was going to his wife's trailer, located one street over, to borrow a heater and to get his wife. According to Audrey Sanders' testimony, defendant returned approximately fifteen to twenty minutes later carrying a baby and yelling, "somebody just stabbed my wife." Defendant and the baby had blood on them. Ms. Sanders testified that the defendant was "crying and carrying on," but that she did not see tears. In her opinion, the defendant's actions in falling down and crying were "putting on."

Sergeant Michael Koszulinski of the Fayetteville Police Department was the first officer dispatched to Audrea Dukes' trailer. When he arrived, rescue squad medics were present and defendant was coming down the front steps of Ms. Dukes' trailer carrying a baby. Defendant stated that "she'd been stabbed" and started screaming that "it was his child." Sergeant Koszulinski testified that he knew the defendant because he had been called to Ms. Dukes' trailer four or five times over the past four to five months in reference to domestic disputes involving defendant and Ms. Dukes. Defendant began moaning or howling; fell against a car with the child in his arms and then lowered himself slowly to the ground and rolled over. Fearing for the child's safety, Sergeant Koszulinski and Sergeant Belcher forcibly took the child from defendant and gave him to Deborah Davis. Sergeant Koszulinski stated that in his opinion the defendant's moaning, howling and falling was an act to draw the officers' attention to him. Sergeant Belcher stated that in his opinion, the actions of defendant moaning, bending his knees and stooping to the ground were attempts by defendant to fake passing out.

Deborah Davis, a neighbor and friend of the victim, testified that on the night in question, she went to Audrea Dukes' trailer between 1:00 and 1:30 a.m. to ask if the defendant would drive her and her daughter to the hospital. Audrea Dukes told Davis that the defendant was not there, but that he was at his own trailer playing cards. Ms. Davis watched Audrea Dukes' son while Audrea went to defendant's trailer to ask him to take Ms. Davis and her daughter to the hospital. According to Ms. Davis, Audrea Dukes returned from defendant's trailer "disappointed and hurt" that the defendant was not at home. Ms. Davis' boyfriend returned at that point and took her and her child to the hospital.

Ms. Davis and her boyfriend returned from the hospital between 3:30 and 4:00 a.m. Ms. Davis saw defendant's car parked at his trailer and Audrea Dukes' lights were not on. Ms. Davis testified that she put her child to bed and she and her boyfriend went to bed. About ten minutes later, she heard Audrea Dukes scream, "Somebody help me." Ms. Davis went out the front door of her trailer and saw defendant coming off the front steps of Audrea Dukes' trailer, carrying his and Audrea Dukes' infant son. She met defendant in the middle of the street and asked what was wrong. Defendant did not reply. Ms. Davis continued to Audrea Dukes' trailer, looked in the open front door, and saw Ms. Dukes lying on her back on the floor. The defendant told Ms. Davis ". . . don't touch her. Don't mess with her." Ms. Davis and her boyfriend went to a nearby convenience store and called an ambulance. Upon returning to Audrea Dukes' trailer, they saw defendant kiss the victim and apologize for "doing it." Ms. Davis stated that she thought the defendant was "faking" his behavior by hollering, moaning, staggering and pretending to cry.

Defendant was arrested at his trailer and brought to the Law Enforcement Center for questioning. He was placed in an interview room with Investigator Jeffrey Stafford of the Fayetteville Police Department, who began reading defendant his *Miranda* rights from a standard printed form. While in the interview room with defendant, Investigator Stafford observed the defendant crying and carrying on. Investigator Stafford attempted twice to read the defendant his *Miranda* rights but stopped part way through both times to calm defendant. During the second attempt to read defendant his rights, the defendant raised his head and stuttered "I . . . I stabbed her." The defendant then requested a cigarette. He was given a cigarette and allowed to take a brief nap. Approximately one

hour later, Investigator Stafford read defendant his *Miranda* rights and the defendant initialed a waiver form. After signing the waiver, defendant told Investigator Stafford that he came home from Raeford; went to Audrea Dukes' trailer; knocked on the door and no one answered; he opened the door; turned on the lights and found her on the floor.

The victim died of a single stab wound to the left chest area. The wound was consistent with the type and shape of knife found with blood on it near the kitchen sink in the victim's trailer.

Defendant testified in his own behalf. According to defendant's testimony, on the night of 13 January 1990, he got off of work early (approximately 10:00 p.m.). He and a co-worker, Marcus Virgil, went to his trailer. Defendant went to his wife's, Audrea Dukes' trailer to borrow a heater. Ms. Dukes wasn't feeling well and asked defendant to take their child to his house. He told her that he would warm up his house and then come back and get their baby. He stated further that he was going to stay at home that evening and play cards. Instead, he and Virgil went to a nightclub in Raeford, North Carolina. Virgil met Audrey Sanders at the club and she returned with them to defendant's trailer at approximately 3:00 a.m. Defendant left Virgil and Sanders at his trailer and drove to Audrea Dukes' trailer. When he arrived at Ms. Dukes' trailer he found his wife angry for his failure to return for the child. He went inside and said that he was going to bed. According to defendant's testimony, he sat down on the bed and began to remove his shoes. When he looked up, Audrea Dukes was standing before him with a knife in her hand. They began "tussling" over the knife and he was tossed onto the bed injuring his back. When he looked up again, Audrea Dukes had been stabbed in the heart. Defendant called his wife's name and she responded, "[I]t will be alright—just get help." She ran out of the room yelling, "Somebody help me." Defendant ran to his car and opened the passenger's side door, then returned to the trailer to help Ms. Dukes to the car, but she had collapsed and he could not lift her. He grabbed the baby and ran to the neighbor's trailer for help. At some point, defendant picked up the knife, wiped it with a washcloth and tossed it into the sink. Defendant returned to the trailer, kissed his wife and said that he was "sorry," "meaning that he was sorry for going to the nightclub."

Defendant moved to dismiss the charges at the close of the State's evidence and at the close of all of the evidence. Both motions were denied. From denial of defendant's motions to suppress, entry of judgment on the verdict and sentencing, defendant appeals.

## I.

[1] Defendant-appellant first argues that the trial court erred by denying his motion to suppress the statement to Officer Thompson. Specifically, defendant contends that Officer Thompson's inquiry as to what had happened, amounted to custodial interrogation and as a result, the defendant should have been advised of his *Miranda* rights prior to that inquiry. Defendant contends that admission of his response that his girlfriend had been hurt, that they were taking her to the hospital and that the police believed that he was responsible, was prejudicial because 1) it was directly inculpatory and 2) it played into the State's theory that defendant was "feigning" his physical and emotional incapacity during the hours following his wife's death.

The Fifth Amendment to the United States Constitution requires a criminal suspect to be informed of his rights prior to a custodial interrogation by law enforcement officers. *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694 (1966). The test for whether a person is "in custody" for *Miranda* purposes is "whether a reasonable person in the suspect's position would feel free to leave or compelled to stay." *State v. Torres*, 330 N.C. 517, 525, 412 S.E.2d 20, 24-25 (1992) (citations omitted). This test is necessarily an objective one to be applied on a case-by-case basis considering all the facts and circumstances. *Id.*

In this case, the following facts are undisputed: Defendant was escorted to his trailer by Officer Moore and Officer Moore remained with him for some period of time. When Officer Thompson arrived, Officer Moore instructed Officer Thompson, in the defendant's presence, to stay in the trailer with defendant, and not to permit defendant to change or wash his clothing. In accordance with these instructions, Officer Thompson remained in the trailer with defendant and accompanied defendant to the bathroom.

We believe that a reasonable person, knowing that his wife had just been killed, kept under constant police supervision, told not to wash or change his clothing and never informed that he was free to leave albeit his own home, would not feel free to

get up and go. On the contrary, a reasonable person in defendant's position would feel compelled to stay. We hold therefore that the defendant was "in custody" when he made the statement at issue to Officer Thompson.

[2] The next issue then is whether Officer Thompson's inquiry, "do you know what happened?" amounted to interrogation. The State contends that it did not. "Interrogation" for the purpose of *Miranda* includes "not only express questioning" of a suspect by police, but also "words or actions on the part of the police . . . that the police should [know] are reasonably likely to elicit an incriminating response from the suspect." *State v. Smith*, 317 N.C. 100, 106-07, 343 S.E.2d 518, 521-22 (1986) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L.Ed.2d 297, 308 (1980)); *State v. Nations*, 319 N.C. 329, 330, 354 S.E.2d 516, 517 (1987).

In this case, Officer Thompson was told to stay with the defendant and ensure that defendant did not wash or change his clothes. While with defendant, Officer Thompson asked defendant if he knew what was happening. The State argues that Officer Thompson did not know any details of the incident under investigation and did not know that the defendant was a suspect. Officer Thompson's question may not have been knowingly designed to elicit an incriminating response from defendant, however, the facts indicate that Officer Thompson did have enough information to at least question whether the defendant was a suspect in a crime. Under these circumstances, we cannot say that Officer Thompson should not have known that his question was "reasonably likely to elicit an incriminating response" from defendant and therefore assume that defendant was in fact subject to interrogation.

[3] Having determined that defendant was in custody and subject to interrogation by Officer Thompson, we next address the issue of whether defendant's reply to Officer Thompson amounted to an inculpatory statement which should have been suppressed by the trial court. When Officer Thompson asked the defendant what had happened, defendant responded that his wife had been hurt, they were taking her to the hospital and the police believed that defendant was responsible. This statement merely represented defendant's opinion as to the suspicions of the police. While this statement may have solidified any prior suspicions that Officer Thompson had regarding the fact that the police believed defendant to be a suspect in a crime, defendant's statement was not an admis-

sion of guilt nor a statement from which guilt would necessarily be inferred. As a result, the statement was not inculpatory. *See State v. Small*, 328 N.C. 175, 400 S.E.2d 413 (1991) (where defendant's statement merely gave differing versions of his whereabouts and activities on the day in question, it was not inculpatory).

Even assuming *arguendo* that the statement was inculpatory and thereby admitted in violation of defendant's rights under the United States Constitution, we are persuaded that the statement "was of such insignificant probative value when compared with the overwhelming competent evidence of guilt that its admission did not contribute to defendant's conviction and therefore admission of the evidence was harmless . . . beyond a reasonable doubt." *State v. Hooper*, 318 N.C. 680, 682, 351 S.E.2d 286, 288 (1987) (quoting *State v. Gardner*, 315 N.C. 444, 449, 340 S.E.2d 701, 706 (1986) ). *See* N.C.G.S. § 15A-1443(b). In addition to largely circumstantial evidence which was ample to show that the defendant had the motive, opportunity and means to kill his wife, the State presented evidence of defendant's own confession which we discuss below. Thus, even if the trial court erred in admitting evidence of defendant's statement that his girlfriend had been hurt, they were taking her to the hospital and the police believed that he did it, other competent evidence pointed overwhelmingly to his culpability and the admission of this statement "did not contribute to his conviction and therefore . . . was harmless . . . beyond a reasonable doubt." *Hooper*, 318 N.C. at 682, 351 S.E.2d at 288.

II.

[4] Defendant next assigns as error the trial court's denial of his motion to suppress his inculpatory statement to Investigator Stafford at the Law Enforcement Center. Defendant contends that he was too distraught to waive his *Miranda* rights and that Investigator Stafford therefore should have terminated the interrogation.

A statement given freely and voluntarily without any compelling influences is not barred by the Fifth Amendment and is completely admissible. *Miranda*, 384 U.S. 436, 16 L.Ed.2d 694. The test of admissibility for any inculpatory statement given subsequent to *Miranda* warnings is whether the statement was in fact voluntarily and understandingly made. *State v. Davis*, 305 N.C. 400, 419, 290 S.E.2d 574, 586 (1982). "Voluntariness" is determined by looking at the totality of the circumstances. *Id.*

STATE v. DUKES

[110 N.C. App. 695 (1993)]

Based upon evidence submitted at the suppression hearing, the trial court made the following pertinent finding of fact.

9. . . . that at 7:27 a.m. the Defendant was arrested; that at that time the Defendant was very calm, not emotional, and very cooperative; that the Defendant after being transported to the Law Enforcement Center was placed in an interview room at 7:49 a.m.; that the Defendant had his head down, crying, calling his baby's name and continued to cry and carry on; that Investigator Stafford, during the advising of the Defendant of his rights at 7:54 a.m., observed the Defendant lift his head up and say, "I stabbed her" then asked for a cigarette; that no tears were observed at that time; that at 7:54 a.m. Investigator Stafford stepped out to get matches and stepped back in at 7:55 a.m.; that at 7:57 a.m. Investigator Stafford tried to calm the Defendant but he did not respond; at 8:06 a.m. the Defendant was observed to be asleep; that at 8:33 a.m. the Defendant was observed to be asleep; that at 8:53 a.m. Stafford awoke the Defendant and the Defendant was allowed to use the restroom; . . . that thereafter at 10:11 a.m. the Defendant made a statement to Investigator Stafford; that in the opinion of Investigator Stafford, the Defendant's behavior was playing on his sympathy.

The trial court's findings of fact concerning the admissibility of the confession are conclusive and binding on appeal when supported by competent evidence. *State v. Simpson*, 314 N.C. 359, 368, 334 S.E.2d 53, 59 (1985). Our review of the record indicates that these findings were supported by competent evidence. Those findings in turn support the trial court's conclusion that the defendant's confession was "voluntary and not a product of custodial interrogation." The evidence shows that Officer Moore had not asked defendant any questions. Rather, Moore was attempting to read defendant his *Miranda* rights, as well as calm him down. While doing so, the defendant confessed. We agree and concur in the trial court's conclusion that defendant's statement was voluntary and find that the admission of the defendant's confession into evidence was free of prejudicial error.

III.

[5] Defendant's final argument contends that the trial court erred by allowing the State's witnesses to testify to their opinions that the defendant was "feigning" mental illness. Defendant made a

STATE v. DUKES

[110 N.C. App. 695 (1993)]

motion *in limine* prior to trial to prohibit law enforcement officers from stating their opinions that defendant was faking his distress either at the scene of his wife's death, in route to the Law Enforcement Center, or at the Law Enforcement Center. The trial court denied the motion and permitted the witnesses to give opinion testimony so long as their opinions were based on their observations of defendant's behavior and not on interpretations of defendant's statements.

Pursuant to the North Carolina Rules of Evidence, a lay witness may give testimony in the form of an opinion if that opinion is "a) rationally based on the perception of the witness and b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701. If based on first-hand knowledge and helpful to the jury, this rule permits lay opinions regarding a defendant's insanity, *State v. Strickland,* 321 N.C. 31, 361 S.E.2d 882 (1987); *State v. Davis,* 321 N.C. 52, 361 S.E.2d 724 (1987); intoxication, *State v. Adkerson,* 90 N.C. App. 333, 368 S.E.2d 434 (1988); and common emotions. *See, e.g., State v. Brown,* 312 N.C. 237, 321 S.E.2d 856 (1984) (lay witness permitted to testify that tone of voice indicated victim was scared).

In this case, each of the witnesses were required to provide foundation testimony which showed that their opinion was based upon their own perception of the defendant's behavior. In addition, where the testimony was helpful to the jury in characterizing the defendant's behavior immediately following the death of his wife, it was not error for the trial judge to permit the testimony.

For the foregoing reasons, the defendant received a fair trial free of prejudicial error, and we find

No Error.

Judges WELLS and GREENE concur.