STATE OF NORTH CAROLINA v. APRIL LEIGH BARBER

No. 24A93

(Filed 5 November 1993)

**Evidence and Witnesses § 1252 (NCI4th) — in-custody interrogation — ambiguous invocation of right to counsel — clarification by questions — admissibility of incriminating statements**

Defendant did not invoke her right to counsel when, in response to warnings as to her *Miranda* and juvenile rights, she asked the interrogating officer whether she needed a lawyer where the officer responded that he could not tell her whether she needed a lawyer but was merely advising her of her rights to a lawyer; the officer asked whether defendant understood each of the rights explained to her and defendant answered affirmatively; defendant answered "Yes" when asked if she wished to answer questions; defendant responded affirmatively when asked whether she wished to answer questions without a lawyer and without her parents, guardian or custodians being present; and defendant then made incriminating statements about the setting of a fire which killed her grandparents. Defendant's inquiry constituted an ambiguous or equivocal invocation of her right to counsel which was clarified by her responses to the narrow questions posed by the officer, and those responses made it clear that defendant was not asking for the assistance of counsel. Therefore, defendant's incriminating statements were admissible in her trial for first-degree murder where the trial court found that the statements

STATE v. BARBER

[335 N.C. 120 (1993)]

were made freely, voluntarily and understandingly after defendant waived her *Miranda* and juvenile rights.

**Am Jur 2d, Criminal Law §§ 732 et seq., 967 et seq.**

**What constitutes assertion of right to counsel following Miranda warnings—state cases. 83 ALR4th 443.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from two judgments imposing sentences of life imprisonment entered by Beaty, J., at the 3 August 1992 Criminal Session of Superior Court, Wilkes County, pursuant to a conditional plea of guilty to two counts of first-degree murder. Heard in the Supreme Court 14 September 1993.

*Michael F. Easley, Attorney General, by Robert J. Blum, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

Following Judge Julius A. Rousseau, Jr.'s denial of her motion to suppress all statements made by her, defendant entered a conditional plea of guilty to two counts of murder in the first degree, preserving her right to appeal the denial of her suppression motion pursuant to N.C.G.S. § 15A-979. Judge James A. Beaty, Jr., accepted the plea and sentenced defendant to two consecutive terms of life imprisonment. The remaining charges against her, one count each of first-degree arson and conspiracy to commit murder, were dismissed by the State.

Defendant appealed to this Court, contending that Judge Rousseau (the hearing judge) erred by denying her motion to suppress a statement made by her to a special agent of the State Bureau of Investigation. She contends that she invoked her right to counsel after being advised of her *Miranda* rights by asking the officer whether she needed a lawyer. We conclude that defendant did not invoke her right to counsel and the hearing judge did not err in denying her motion to suppress.

A fire on the night of 4 September 1991 in a home located on Fireplanes Road in Wilkes County resulted in the deaths of Lillie and Aaron Barber. The house was a one-story wood frame

brick veneer residence with a full basement. Defendant, who was fifteen years old at the time, was the adopted daughter of the Barbers although she referred to them as her grandparents. Lillie Barber was seventy-seven years old and Aaron was eighty-three. Aaron Barber died of smoke inhalation on the night of the fire and Lillie Barber died one week after the fire as a result of fire-related injuries.

Special Agent T.A. Rasmussen, an arson investigator with the S.B.I., conducted an investigation of the home shortly after the fire. He found burn patterns throughout the house, indicating that a flammable or combustible liquid had been poured on various places within the house. Special Agent Rasmussen testified that certain burned areas revealed the odor of gasoline. Samples were also taken from various points in the house which were examined and showed the presence of gasoline.

Officer Robert Benfield, from the Wilkes County Sheriff's Department, testified that at 11:50 p.m. on 4 September 1991 he was called to investigate the fire. Benfield located defendant at the home of Emily Taylor, Aaron Barber's sister, where defendant had gone after being released from Wilkes Regional Medical Center following the fire. Defendant's natural mother, Sheila Barber, was also present. Defendant gave investigators two statements, the first to Officer Benfield while at the home of Emily Taylor.

In the statement to Officer Benfield, defendant said that on the evening of the fire she was at home watching television and her grandparents were in the bathroom where her grandmother was assisting her grandfather in taking a bath. Defendant saw a spark or flicker near the television and ran out the door to the carport, carrying the cordless telephone with her. Defendant explained that she always carried the telephone with her. Defendant stated that she did not tell her grandparents that the house was on fire. In the carport defendant tried to use the telephone to call 911, but the fire had damaged the phone lines and she was unable to get through. A short time later a truck pulled into a neighbor's driveway. The occupants of the truck, a man and a woman, approached defendant and asked if there was anyone else in the house. Defendant told them that her grandparents were inside. The man directed defendant to go to a neighbor's home and call for help, which she did. When defendant returned to her home, she saw a crowd of people gathered around her grandmother,

Lillie, who had escaped from the house. Defendant approached her grandmother and informed Lillie that she (defendant) was all right. Lillie responded that she did not think that defendant's grandfather Aaron had made it. Defendant returned to the neighbor's house, called her boyfriend and told him about the fire. He told her that he would come over immediately. Defendant could not recall anything else that happened. Benfield testified that defendant's boyfriend was named Clinton Johnson and that he was thirty years old.

Defendant's second statement was given to Special Agent Steve Cabe of the S.B.I. at the Wilkes County Sheriff's Department. In this statement, defendant confessed that she had kicked over a jug of gasoline in the house and the snap-on lid had come off spilling some of the gasoline. Her boyfriend had brought the gasoline to the house on or about 1 September, which was about four days before the fire. After the gasoline had spilled, defendant carried the jug to the hallway and poured gasoline out onto the floor. She lit the gasoline on the carpet by first lighting a newspaper with a cigarette lighter which she then dropped on the carpet. Defendant's grandparents were in the bathroom where Lillie was assisting Aaron in taking a bath at the time. Defendant did not know why she lit the gasoline. She stated that she and her grandparents had argued on the night of the fire but the argument had not been serious. She stated that she wanted her grandparents to be less strict and to give her more space. Defendant stated repeatedly that she did not expect the fire to kill her grandparents, she did not intend for either of them to die, nor did she want them dead; in fact she thought that dealing with the fire might bring her family closer together. Defendant stated that she was sorry that her grandfather had died, but that he was "better off" dead and she thought that her grandmother would be better off if she died also, because she would be lonely without Aaron. Defendant and her boyfriend had talked about the fact that her grandparents would be better off dead, and on several occasions talked about how to get rid of them. They had never decided how to do it, although they had talked about burning the house down. They also talked about shooting them or poisoning them.

Juvenile petitions charging defendant with one count of arson, two counts of first-degree murder, two counts of felonious assault, and two counts of conspiracy were filed in Wilkes County District Court, Juvenile Division, on 5, 9, and 12 September 1991. On 1

STATE v. BARBER

[335 N.C. 120 (1993)]

October 1991, District Court Judge Edgar B. Gregory allowed the State's motion to transfer the cases to Superior Court. On 11 November 1991, defendant was indicted in Superior Court on two counts of first-degree murder, one count of first-degree arson, and one count of conspiracy to commit murder. A motion by defendant to suppress any and all statements made by her was heard at the 1 June 1992 Criminal Session of Superior Court, Wilkes County, before Judge Julius A. Rousseau, Jr. Defendant's motion was denied by oral order on 5 June 1992 and a written order denying the motion was entered on 12 June 1992.

At the 3 August 1992 Criminal Session of Superior Court, Wilkes County, Judge James A. Beaty, Jr., presiding, defendant pled guilty to two counts of first-degree murder, reserving her right to appeal the denial of her suppression motion. N.C.G.S. § 15A-979(b) (1988). Defendant was sentenced to two consecutive terms of life imprisonment, N.C.G.S. § 14-17 (1992), and the remaining charges against her were dismissed.

On appeal to this Court, defendant makes one argument: Judge Rousseau erred by denying her motion to suppress her statement made to S.B.I. Agent Cabe at the Wilkes County Sheriff's Department. More specifically, defendant contends that law enforcement officers continued to interrogate her after she had invoked her right to counsel, in violation of her constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution. Therefore, the confession made by her in response to the interrogation must be deemed involuntary and inadmissible. She further contends that her confession was involuntary in that it was induced by threats and promises in violation of her state and federal due process rights.

Defendant's plea of guilty was conditioned on the admissibility of her confession. Thus, if defendant is correct in her contentions, her plea of guilty must be stricken and the case remanded to superior court for further proceedings. If, on the other hand, her contentions are without merit, her guilty plea, and the sentences entered thereon, must stand. We proceed therefore to a consideration of defendant's contentions supporting her argument that the hearing judge erred by denying her motion to suppress her statement made to Special Agent Cabe.

Prior to ruling on the motion to suppress, Judge Rousseau held an extensive voir dire hearing. Following the hearing, Judge Rousseau found facts as follows:

That on September the 4th, 1991, at about 11:50 p.m., Detective Benfield of the Wilkes County Sheriff's Department was assigned to investigate a fire in which two people were killed as a result of the fire. Officer Benfield was informed that the defendant was the granddaughter of the two deceased persons, lived in the home with her grandparents and was probably in the house when the fire started; that he first went to Wilkes Regional Hospital and was told that the defendant had already left. Officer Benfield then located the defendant at a residence about two and a half miles from the county courthouse at about 3:30 a.m. on Thursday, September 5, 1991; At that time, Officer Benfield was in street clothes and driving an unmarked car and was accompanied by Deputy Terry Wright, who was in uniform and driving a marked car;

That at the residence, the defendant was on the couch and a lady and the defendant's natural mother were present. Officer Benfield advised the defendant that he wanted to talk to her about the fire to find out what she knew about it. At that time, the defendant was not a suspect, but merely a potential witness. The defendant met with the two officers in the presence of her natural mother, at which time the defendant made a statement about being in the house when the fire started and running out to get help. The officers talked to the defendant for approximately thirty minutes, during which time the defendant did not incriminate herself;

That after taking this statement from the defendant, Officer Benfield went outside the residence and called his supervisor, Lieutenant Walsh, at about 4:45 a.m. Lieutenant Walsh arrived about 5:30 or a quarter of 6:00; that after conferring with Officer Benfield, Lieutenant Walsh told the defendant that he needed to talk to her further concerning the fire and wanted her to go to the Sheriff's Office. He advised her that she was the only one in the house at the time of the fire who was still alive and they needed to find out about the fire; that the defendant stated that she would go to the Sheriff's Office; that Lieutenant Walsh asked the defendant's mother if she wanted to go, but the mother declined the invitation;

that Officer Benfield and the defendant then left while Lieutenant Walsh stayed for a few minutes to talk with the defendant's mother;

That the defendant was not told that she had to go to the Sheriff's Office; that she was not placed in handcuffs, but rode on the right front seat for the approximately two and a half miles to the Sheriff's Office; that Officer Benfield and the defendant arrived at the Sheriff's Office shortly after 6:00 a.m.;

That the Sheriff's Office is located approximately one-third block from the jail, is a one-story frame building used at one time as a barber shop and now converted into a Sheriff's Office and Detective Office; that the defendant was never told that she was under arrest, but only that she was needed as a witness; that upon entering the office, there is a reception area with a couch and various offices located throughout the building. Upon entering the Sheriff's Office, Officer Benfield offered the defendant a drink and showed her the restroom also; that the defendant sat on the couch and waited for Lieutenant Walsh to come; that during this time, Officer Benfield asked the defendant if she wanted breakfast and said he could get it from the jail since it was about breakfast time; that the defendant said she was not hungry and did not want it. Officer Benfield did not again talk to the defendant until about 11:30 a.m., and at that time offered her lunch; that Office Benfield's wife then came in carrying a pizza and offered a pizza to the defendant, which the defendant refused. Officer Benfield did not again talk to the defendant until 3:30 that afternoon.

Lieutenant Walsh arrived in civilian clothes at the Sheriff's Office at about 6:30 or 6:45 and saw the defendant shortly after 7:00 a.m. sitting on the couch in the Detectives' Office. At or about that time, Special Agent Steve Cabe, with the SBI, also arrived; that he, too, was in civilian clothes, but dressed in coat and tie; that Lieutenant Walsh and Agent Cabe talked for a few minutes outside the Sheriff's Office discussing the situation and, particularly, as to how to talk to the defendant inasmuch as she was fifteen years of age and some months; that they talked about how to be careful with her due to her age;

That about 7:20 a.m., Agent Cabe and Lieutenant Walsh then talked with the defendant; they told her she was not under arrest; that she was only a witness; that all they wanted to do was to talk with her and not to be afraid.

Lieutenant Walsh read the defendant the Miranda rights at about 7:20 a.m. on September the 5th, 1991, in the Detectives' Office in the Wilkes County Sheriff [sic] Department; that he advised the defendant that she had a right to remain silent; that anything she said could be used against her; that she had a right to have a parent, guardian or custodian present during questioning; that she has [sic] a right to talk to a lawyer for advice before question [sic] and to have a lawyer with her during questioning; that if she could not afford a lawyer, that a lawyer would be appointed for her; that if she consented to answer questions now without a lawyer, parent, guardian being present, she still had a right to stop at any time.

That the defendant then asked the officer if she needed a lawyer, and the officer said he could not advise her of whether she needed a lawyer or not, but that he was merely advising her of her rights to a lawyer; that the officer then asked her, "Do you understand each of these rights I've explained to you?" That the defendant answered, "Yes." "Having these rights in mind, do you wish to answer questions?" The defendant answered, "Yes." "Do you wish to answer questions without a lawyer present?" "Yes." "Do you now wish to answer questions without your parents, guardian or custodians present?" And, the defendant answered, "Yes."

That the defendant admits answering each of the questions "Yes" but does not remember the officer asking [sic] her, "You have a right to have a parent, custodian or guardian present."

That it took approximately eight minutes to advise the defendant of her rights; that Agent Cabe and Lieutenant Walsh then proceeded to talk to the defendant, and did talk to her from about 7:30 to 12:20; that during this period of time the officers were in the defendant's presence, at the most three hours; that on one occasion, SBI Agent Rasmussen came in and inquired about some aspect of the fire, he being an arson expert, and that he advised her that if she didn't tell the truth, he could find it out; that on one of the occasions while

the officers were out of the room, the defendant drew a picture of Snoopy; that while she was there in the officers' presence, the defendant was very poised and mature acting; that she was not excited; that there were no tears; she showed no emotion; that she was courteous and polite and soft spoken, but did appear sleepy.

That the defendant advised the officers that she was in the tenth grade, and that the school personnel had suggested that she might skip the eleventh grade and go to the twelfth grade; that she wanted to be an artist.

At no time did Lieutenant Walsh or Agent Cabe tell her that if she didn't tell the truth that they would call in someone who could tell whether she was telling the truth or what the truth was;

That during the entire interview, the defendant did not appear confused; that she never requested any food or water, even though food and drink were offered to her four or five different times, and each time the defendant refused it; that at no time did the defendant complain; she appeared to understand the questions; that her answers were responsive to the questions; that she never asked for any attorney; that no promises were made, and that she was never threatened; that the defendant appeared to show no emotion and did not appear to be nervous;

That the Court, having observed the defendant testify from the witness stand, is of the belief that the defendant is mature for her age; that she was articulate, and appeared to be well educated and above average intelligence.

Defendant does not challenge the hearing judge's findings of fact. Thus we accept these findings of fact as the basis for decision in this case and move to the question of whether the findings of fact support the conclusions of law and whether the conclusions support the order entered by the hearing judge. Judge Rousseau stated his conclusions as follows:

Based on the foregoing, the Court concludes when the officers went to the residence at about 3:30 a.m. on September the 5th, 1991, that the defendant had been listed as a witness, and the officers had every right to talk to her as a witness to find out what, if anything, she knew about the facts, and

STATE v. BARBER

[335 N.C. 120 (1993)]

that any statement she gave to the officer at the time was freely, voluntarily and understandingly made in the presence of her mother.

The Court further concludes that the defendant freely, voluntarily and willingly consented to go to the Sheriff's Office in Wilkesboro, and at that time she was not under arrest; she was not a suspect, but only that the officers were trying to obtain more information as to the cause of the fire, and what the only eyewitness might have known about it.

The Court further concludes that once the defendant arrived at the Sheriff's Office, she was still not in custody; was not under arrest, and freely, voluntarily and understandingly made a statement to the officers.

The Court further concludes that even if the defendant was in custody after arriving at the Sheriff's Office and staying there for some period of time, if that's deemed to be custody, then the defendant was advised of her juvenile rights; that she voluntarily acknowledged having received each of those rights; and voluntarily waived each of those rights, and that the statement she gave thereafter to the officers was freely, voluntarily and understandingly given.

While the trial court's findings of fact are binding on this Court if supported by the evidence, the conclusions are questions of law which are fully reviewable by this Court on appeal. *See State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982). Thus, we are not bound by the trial court's conclusion that defendant was not in custody at the time she made the statement in question. Rather, for purposes of this appeal, we assume, as defendant contends in her brief, that she was in custody and therefore entitled to the 5th and 14th Amendment protections of *Miranda* and *Edwards*.

In the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court "established a number of prophylactic rights designed to counteract the 'inherently compelling pressures' of custodial interrogation, including the right to have counsel present." *McNeil v. Wisconsin*, --- U.S. ---, 115 L. Ed. 2d 158, 167 (1991). The Court in *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, *reh'g denied*, 452 U.S. 973, 69 L. Ed. 2d 984 (1981), added a second layer of protection by holding that once an individual invokes his right to counsel all custodial

STATE v. BARBER

[335 N.C. 120 (1993)]

interrogation must cease until an attorney is present or the individual himself initiates further communication with the police. *See State v. Torres*, 330 N.C. 517, 412 S.E.2d 20 (1992).

Therefore, the crucial question in this case is whether defendant invoked her right to counsel in response to the *Miranda* and juvenile warnings. If she invoked her right to counsel after being given the *Miranda* warnings, then any statement made by her in response to custodial interrogation initiated by the officers in the absence of counsel would be inadmissible. *See Smith v. Illinois*, 469 U.S. 91, 83 L. Ed. 2d 488 (1984).

In discussing what constitutes an invocation of one's right to counsel, we stated in *State v. Torres*:

> There are no "magic words" which must be uttered in order to invoke one's right to counsel. The crucial determination is whether the person has indicated "in any manner" a desire to have the help of an attorney during custodial interrogation. To require precise and exact language to invoke one's right to counsel would undermine *Miranda* by working to the disadvantage of those who arguably need its protection the most: the uneducated and those unfamiliar with the criminal justice system. *See Randall*, 1 Cal. 3d at 955, 464 P.2d at 118, 83 Cal. Rptr. at 662 [1970]. In deciding whether a person has invoked her right to counsel, therefore, a court must look not only at the words spoken, but the context in which they are spoken as well.
>
> . . . .
>
> We recognize that some courts have found, on the facts of a particular case, a question such as "Do you think I need an attorney" to be equivocal or ambiguous. *E.g., Ruffin*, 524 A.2d at 700; *Russell v. Texas*, 727 S.W.2d 573, 575-76 (Tex. Crim. App.), *cert. denied*, 484 U.S. 856, 98 L. Ed. 2d 119 (1987). The Supreme Court has expressly left unresolved the question of what is the appropriate response to an ambiguous invocation of counsel. *Barrett*, 479 U.S. at 529 n.3, 93 L. Ed. 2d at 928 n.3; *Smith v. Illinois*, 469 U.S. 91, 96-97 & n.3, 83 L. Ed. 2d 488, 494 & n.3 (1984). The majority rule, however, appears to be that, *when faced with an ambiguous invocation of counsel, interrogation must immediately cease except for narrow questions designed to clarify the person's true intent. E.g., Crawford*

**STATE v. BARBER**

[335 N.C. 120 (1993)]

*v. State,* 580 A.2d 571, 576-77 (Del. 1990); *Towne v. Dugger,* 899 F.2d 1104, 1107, *cert. denied,* --- U.S. ---, 112 L. Ed. 2d 546 (1990).

*State v. Torres,* 330 N.C. at 528-29, 412 S.E.2d at 26-27 (emphasis added).

In *Torres* we examined the facts and concluded that defendant invoked her right to counsel when she inquired of the sheriff's officials whether she needed an attorney. In examining the facts in the instant case, however, we reach the opposite conclusion.

In *Torres,* defendant, while in police custody, was told that she would be interrogated by a deputy sheriff and an S.B.I. agent.

> The trial judge found that at some point in the evening, defendant "made inquiry about an attorney . . . [and] was advised that she did not need one at that time." It is not clear from this finding of fact exactly when this inquiry was made; however, witnesses testified that defendant actually made two such inquiries: one to Deputy Sykes, another to Sheriff Sheppard. Based on these facts, we believe defendant indicated a desire, on at least one occasion, to have the help of an attorney during police interrogation.

*Torres,* 330 N.C. at 528-29, 412 S.E.2d at 27. In *Torres,* we went on to cite several cases where similar inquiries were treated as an invocation of the right to counsel. After noting the majority rule that when faced with an ambiguous invocation of counsel, interrogation must immediately cease except for narrow questions designed to clarify the person's true intent, we applied the rule to the facts of that case as follows:

> Under this rule, therefore, even if defendant's invocation in this case is termed ambiguous, the result remains the same. The officers clearly did not seek to clarify defendant's intent; instead, they dissuaded defendant from exercising her right to have an attorney present during interrogation. Under these circumstances, we must resolve any ambiguity in favor of the individual. *See Towne,* 899 F.2d at 1110 ("because [defendant] made an equivocal request for an attorney that was never clarified, and [defendant] did not initiate further interrogation, the confession was obtained in violation of his Fifth Amendment rights.").

We therefore hold that defendant invoked her right to counsel when she inquired of sheriff's officials whether she needed an attorney.

*Id.* at 529-30, 412 S.E.2d at 27.

The facts found by the trial court in the instant case contrast sharply with the facts in *Torres*. Here, Judge Rousseau found that after Lieutenant Walsh advised defendant of her rights, including the "right to have a parent, guardian or custodian present during questioning; a right to talk to a lawyer for advice before question[ing] and to have a lawyer with her during questioning; that if she could not afford a lawyer a lawyer would be appointed for her and that if she consented to answer questions now without a lawyer, parent, [or] guardian being present, she still had a right to stop at any time[,]" defendant then asked the officer if she needed a lawyer. The officer's response was that "he could not advise her of whether she needed a lawyer or not, but that he was merely advising her of her rights to a lawyer." The officer then asked defendant, "Do you understand each of these rights I have explained to you?" Defendant answered, "Yes." "Having these rights in mind, do you wish to answer questions?" Defendant answered, "Yes." The officer then asked whether she wished to answer questions without a lawyer present and whether she wished to answer questions without her parents, guardian or custodians present and the answer in both cases was "Yes."

Looking not only at the words spoken, but the context in which they were spoken, we conclude that defendant's inquiry in response to the *Miranda* warnings constituted an ambiguous or equivocal invocation of the right to counsel which was clarified by her responses to the narrow questions posed by the interrogating officer. The responses to those narrow questions made it clear that defendant was not asking for the assistance of an attorney during questioning. Thus we hold that under the facts of this case defendant did not invoke her right to counsel when she asked the officer if she needed a lawyer.

We also hold that the hearing judge's findings of fact support the conclusions of law that "the defendant . . . voluntarily waived [her juvenile and *Miranda*] rights, and that the statement she gave thereafter to the officers was freely, voluntarily and understandingly given." These conclusions support the hearing judge's order that the statement given by defendant to Agent Cabe was admis-

sible in this case. Thus we affirm Judge Rousseau's order denying defendant's motion to suppress her statement and we find no error in the judgments entered by Judge Beaty sentencing defendant pursuant to her guilty plea.

NO ERROR.