674 S.E.2d 795 (2009)
In the Matter of J.D.B. Juvenile.
No. COA08-499.
Court of Appeals of North Carolina.
April 7, 2009.
*796 Roy Cooper, Attorney General, by LaToya B. Powell, Assistant Attorney General, for the State.
*797 Lisa Skinner Lefler, Wilmington, for juvenile-appellant.
MARTIN, Chief Judge.
On 19 October 2005, juvenile petitions were filed against juvenile J.D.B. for two counts each of felonious breaking and entering and larceny. Subsequently, J.D.B. filed a motion to suppress certain inculpatory statements made to law enforcement officers, as well as other evidence obtained by them, on the grounds that the statements and evidence were obtained through an unlawful custodial interrogation which occurred on 29 September 2005. After hearing evidence, the trial court denied the motion to suppress. Reserving his right to appeal the denial of his motion to suppress, J.D.B. entered a transcript of admission to both counts of felonious breaking and entering and larceny as alleged in the petitions. The trial court adjudicated J.D.B. delinquent and entered a disposition order placing J.D.B. on probation and awarding restitution to the victims. J.D.B. then appealed the denial of his motion to suppress and the portion of the disposition order requiring him to pay restitution.
This Court issued an opinion affirming the order of restitution but remanding this case for proper findings of fact to support the trial court's denial of the motion to suppress. See In re J.B., 183 N.C.App. 299, 644 S.E.2d 270 (2007) (unpublished) (remanding to the trial court for proper findings of fact regarding whether the juvenile was in custody for Miranda purposes). Upon remand, the trial court filed and entered its order making findings of fact, conclusions of law, and denying J.D.B.'s motion to suppress. J.D.B. now appeals from this second order. In denying the motion, the trial court made, upon remand, the following findings of fact which have not been challenged on appeal:
5. [J.D.B.] is in the seventh grade and enrolled in special education classes.
6. [J.D.B.] was escorted from his class and into a conference room to be interviewed. Present in the room were Investigator DiCostanzo, Assistant Principal David Lyons, a school resource officer and an intern. The door was closed, but not locked.
7. [J.D.B.] was not administered Miranda warning [sic] and was not offered the opportunity to speak to a parent or guardian prior to the commencement of questioning. Additionally, no parent or guardian was contacted prior to [J.D.B.]'s removal from class.
8. Investigator DiCostanzo asked [J.D.B.] if he would agree to answer questions about recent break-ins. [J.D.B.] consented.
9. [J.D.B.] stated that he had been in the neighborhood looking for work mowing lawns and initially denied any criminal activity.
10. Mr. Lyons then encouraged [J.D.B.] to "do the right thing" and tell the truth.
11. The investigator questioned him further and confronted him with the fact that the camera had been found.
12. Upon [J.D.B.]'s inquiry as to whether he would still be in trouble if he gave the items back, the investigator responded that it would be helpful, but that the matter was still going to court and that he may have to seek a secure custody order.
13. [J.D.B.] then confessed to entering the houses and taking certain items together with another juvenile.
14. The investigator informed [J.D.B.] that he did not have to speak with him and that he was free to leave. He asked him if understood [sic] that he was not under arrest and did not have to talk with the investigator.
15. [J.D.B.] indicated by nodding "yes" that he understood that he did not have to talk to the officer and that he was free to leave. He continued to provide more details regarding where certain items could be located.
16. [J.D.B.] wrote a statement regarding his involvement in the crime.
17. The bell rang signaling the end of the day and [J.D.B.] was allowed to leave to catch his bus home.
18. The interview lasted from 30 to 45 minutes.
19. The investigator had informed [J.D.B.] that he would see him later and *798 would be speaking to his grandmother and aunt.
20. Investigator DiCostanzo and Officer Hunter went to the home of [J.D.B.], but found no one home. When [J.D.B.] arrived, he told the officers they could look around and he would show them where the jewelry was located.
21. Investigator DiCostanzo informed [J.D.B.] that he needed to obtain a search warrant and left Officer Hunter to wait outside [J.D.B.]'s home.
22. While awaiting the search warrant, [J.D.B.] brought a ring to the officer from inside the home.
23. Upon the investigator's return with the warrant, [J.D.B.] entered the home with the officers and handed them several stolen items and led the investigator to where other items could be found on the roof of a gas station down the road. During the entire time that the officers were at his residence and travelling [sic] with him to the BP station, no parent or guardian was contacted or advised of the situation. [J.D.B.] was not advised of his Miranda warnings or told he had the right to speak to or have a parent or guardian present.
24. Investigator DiCostanzo left his card and a copy of the search warrant at [J.D.B.]'s residence.
25. All of [J.D.B.]'s responses to the officer's questions were appropriately responsive, indicating that he was capable of understanding the fact that he did not have to answer questions.
26. All of [J.D.B.]'s responses to counsel during the suppression hearing were appropriately responsive.
Based on these findings, the trial court concluded that at no point during the course of events on 29 September 2005 was J.D.B. in custody. The trial court also concluded that all of the statements made by J.D.B. and actions taken by J.D.B. in the presence of law enforcement occurred voluntarily. Based on these conclusions of law, the trial court ordered that the motion to suppress be denied.
On appeal, J.D.B. assigns error to the trial court's denial of his motion to suppress, arguing that his statement to officers occurred during a custodial interrogation where officers failed to administer the proper warnings under Miranda and N.C.G.S. § 7B-2101(a), thus violating his Fifth Amendment rights. As part of this argument, J.D.B. contends that, because "no reasonable special education, thirteen-year-old seventh grader without his guardian or some other advocate would [have felt] free to leave," the trial court should have concluded that J.D.B. was in custody for purposes of Miranda and N.C.G.S. § 7B-2101(a). We disagree.
We begin by noting that the trial court's findings of fact after a hearing concerning the admissibility of a confession are conclusive and binding on this Court when supported by competent evidence. See State v. Barber, 335 N.C. 120, 129, 436 S.E.2d 106, 111 (1993), cert. denied, 512 U.S. 1239, 114 S.Ct. 2747, 129 L.Ed.2d 865 (1994). The trial court's conclusions of law, however, are reviewable de novo. See id. Under this standard, the legal significance of the findings of fact made by the trial court is a question of law for this Court to decide. See State v. Davis, 305 N.C. 400, 415, 290 S.E.2d 574, 583 (1982).
The Fifth Amendment of the United States Constitution guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court determined that the prohibition against self-incrimination requires that, prior to a custodial interrogation, a defendant must be advised
that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
Id. at 479, 86 S.Ct. at 1631, 16 L.Ed.2d at 726. The Miranda rule "was conceived to protect an individual's Fifth Amendment *799 right against self-incrimination in the inherently compelling context of custodial interrogation by police officers." State v. Buchanan, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001); see also Miranda, 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 706.
In addition to the warnings required by the Miranda decision, our General Assembly has mandated other protections for juveniles, as set out in N.C.G.S. § 7B-2101(a). Under this statute, prior to questioning, an in-custody juvenile must be advised that:
(1) he has the right to remain silent; (2) any statement he makes can be and may be used against him; (3) that he has a right to have a parent, guardian, or custodian present during questioning; [and] (4) that he has a right to consult with an attorney and that one will be appointed for him if he is not represented and wants representation.
In re W.R., 179 N.C.App. 642, 645, 634 S.E.2d 923, 926 (2006) (citing N.C. Gen.Stat. § 7B-2101(a) (2005)). However, the rights protected by Miranda and N.C.G.S. § 7B-2101(a) apply only to custodial interrogations. See State v. Gaines, 345 N.C. 647, 661, 483 S.E.2d 396, 404-05, cert. denied, 522 U.S. 900, 118 S.Ct. 248, 139 L.Ed.2d 177 (1997) (noting that "the rule of Miranda applies only where a defendant is subjected to custodial interrogation," and that, "similarly, N.C.G.S. § 7A-595(d) [now N.C.G.S. § 7B-2101(a)] pertains only to statements obtained from a juvenile defendant as the result of custodial interrogation").
"[C]ustodial interrogation ... mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (1966); Buchanan, 353 N.C. at 337, 543 S.E.2d at 826. "[I]n determining whether a suspect is in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." Buchanan, 353 N.C. at 338, 543 S.E.2d at 827. This involves "`an objective test as to whether a reasonable person in the position of the defendant would believe himself to be in custody or that he had been deprived of his freedom of action in some significant way.'" State v. Sanders, 122 N.C.App. 691, 693, 471 S.E.2d 641, 642 (1996) (quoting State v. Greene, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992)). No single factor controls the determination of whether an individual is "in custody" for purposes of Miranda. State v. Garcia, 358 N.C. 382, 397, 597 S.E.2d 724, 737 (2004) (citing State v. Barden, 356 N.C. 316, 338, 572 S.E.2d 108, 124 (2002)), cert. denied, 538 U.S. 1040, 123 S.Ct. 2087, 155 L.Ed.2d 1074 (2003). Circumstances supporting an objective showing that one is "in custody" might include a police officer standing guard at the door, locked doors, or application of handcuffs. Buchanan, 353 N.C. at 339, 543 S.E.2d at 828. The subjective belief of the defendant as to his freedom to leave is not in and of itself determinative. State v. Hall, 131 N.C.App. 427, 432, 508 S.E.2d 8, 12 (1998), aff'd, 350 N.C. 303, 513 S.E.2d 561 (1999). Furthermore, our Supreme Court has held that an objective "free to leave test" is broader than, and not synonymous with, the appropriate test for determining the custody issue. See Buchanan, 353 N.C. at 339-40, 543 S.E.2d at 828.
Here, the trial court found that J.D.B. was escorted from class and into the conference room by a uniformed school resource officer. Present in the room were Investigator DiCostanzo, two school officials, and the school resource officer. The door was closed but not locked. J.D.B. was not searched or handcuffed. J.D.B. only began speaking with Investigator DiCostanzo after agreeing to answer questions. Furthermore, J.D.B.'s responses and questions indicated that he understood he did not have to answer questions, that he was not under arrest, and that "the matter was still going to court." After writing his own statement regarding his involvement in the crime, J.D.B. left the conference room and school property when the bell rang, the interview having lasted approximately 30 to 45 minutes. Later, when officers met with J.D.B. at his home, J.D.B. *800 freely offered to let the officers look around the house and even brought a piece of stolen jewelry out to Officer Hunter after Investigator DiCostanzo had gone to get a search warrant. When Investigator DiCostanzo returned with the warrant, J.D.B. voluntarily led the officers through the house and to the locations of other stolen items. These findings are uncontested. Although J.D.B. argues on appeal that Investigator DiCostanzo threatened him with a secure custody order, we note that the trial court did not make any finding of fact that J.D.B. was threatened. The trial court's Finding of Fact 12, which provides that, "upon [J.D.B.]'s inquiry, ... the investigator responded that ... he may have to seek a secure custody order," (emphasis added), is supported by competent evidence and thus binding upon this Court on appeal. See Barber, 335 N.C. at 129, 436 S.E.2d at 111.
As discussed above, the appropriate standard for determining whether an individual is "in custody" is whether a reasonable person in the individual's position would have believed himself to be in custody or deprived of his freedom of action in some significant way. Sanders, 122 N.C.App. at 693, 471 S.E.2d at 642. This test is "objective ... based upon the reasonable person standard, and is `to be applied on a case-by-case basis considering all the facts and circumstances.'" Hall, 131 N.C.App. at 432, 508 S.E.2d at 12 (quoting State v. Medlin, 333 N.C. 280, 291, 426 S.E.2d 402, 407 (1993)). "The objective test furthers `the clarity of [Miranda's] rule,' ensuring that the police do not need to `gues[s] as to [the circumstances] at issue before deciding how they may interrogate the suspect.'" Yarborough v. Alvarado, 541 U.S. 652, 667, 124 S.Ct. 2140, 158 L.Ed.2d 938, 945 (2004) (quoting Berkemer v. McCarty, 468 U.S. 420, 430-31, 104 S.Ct. 3138, 82 L.Ed.2d 317, 329 (1984)). Thus, J.D.B.'s subjective belief that he was not free to leave is not, in and of itself, determinative of whether he was "in custody." See Hall, 131 N.C.App. at 432, 508 S.E.2d at 12. Instead, we must examine all of the circumstances surrounding J.D.B.'s interactions with officers and apply the objective test discussed above. See Buchanan, 353 N.C. at 338, 543 S.E.2d at 827.
An individual's mental capacity and age, standing alone, are not determinative of whether he is "in custody" for purposes of Miranda and N.C.G.S. § 7B-2101(a). In fact, "consideration of a suspect's individual characteristics  including age  could be viewed as creating a subjective inquiry." Yarborough, 541 U.S. at 668, 124 S.Ct. at 2152, 158 L.Ed.2d at 945 (citing Oregon v. Mathiason, 429 U.S. 492, 495-96, 97 S.Ct. 711, 50 L.Ed.2d 714, 719 (1977) (noting that facts arguably relevant to whether an environment is coercive may have "nothing to do with whether respondent was in custody for purposes of the Miranda rule")). Instead, an individual's subnormal mental capacity and age are factors to be considered when determining whether a knowing and intelligent waiver of rights has been made. See State v. Fincher, 309 N.C. 1, 8, 305 S.E.2d 685, 690 (1983) (citing State v. Jenkins, 300 N.C. 578, 268 S.E.2d 458 (1980) (holding that though defendant was mildly mentally retarded, he knowingly and intelligently waived his right to counsel before making a custodial statement); State v. Thompson, 287 N.C. 303, 214 S.E.2d 742 (1975) (holding that, 19-year-old defendant with an I.Q. of 55 was capable of waiving his rights)). The rights protected by Miranda and N.C.G.S. § 7B-2101(a) only apply to custodial interrogations. See Gaines, 345 N.C. at 661, 483 S.E.2d at 404-05 (citing State v. Phipps, 331 N.C. 427, 442, 418 S.E.2d 178, 185 (1992)). As such, the question of whether those rights have been waived is irrelevant unless the individual was in custody.
Here, the trial court utilized the appropriate standard for determining whether J.D.B. was in custody during his 29 September 2005 interactions with officers. Upon our review of the trial court's uncontested findings of fact, we conclude that a reasonable person in J.D.B.'s position would not have believed himself to be in custody or deprived of his freedom of action in some significant way. Because J.D.B. was not in custody during his interactions with officers in the case at bar, we need not decide any issue regarding waiver of J.D.B.'s rights under Miranda or N.C.G.S. § 7B-2101(a). Accordingly, we conclude *801 that the trial court correctly denied J.D.B.'s motion to suppress.
Affirmed.
Judge BRYANT concurs with separate opinion.
Judge BEASLEY dissents with separate opinion.
BRYANT, Judge, concurring in a separate opinion.
I write separately to reiterate that the test for determining whether a juvenile is in custody thereby warranting a Miranda warning is an objective test to be applied on a case-by-case basis based on the totality of the circumstances. State v. Buchanan, 353 N.C. 332, 339-40, 543 S.E.2d 823, 828 (2001). I also write to distinguish the instant case from In re W.R., 179 N.C.App. 642, 634 S.E.2d 923 (2006), where this Court vacated a juvenile adjudication when the juvenile's incriminating statement was obtained during questioning without being given the proper Miranda warnings.
In W.R., we considered whether the questioning of the juvenile was non-custodial and, as such, did not require a Miranda warning. Id. at 644, 634 S.E.2d at 925. The juvenile, a fourteen-year-old, middle school student, was taken from his classroom to the Assistant Principal's office where he was repeatedly questioned for thirty minutes by the Principal, Assistant Principal, and the School Resource Officer (SRO) (who was also an officer with the Greensboro Police Department) regarding whether he possessed a knife at school on the previous day. Id. at 623, 634 S.E.2d at 924-25. No indication was given that the juvenile was free to leave. In fact "the juvenile was kept in the office under the supervision of [the SRO] while both the Principal and Assistant Principal stepped out to interview other students." Id. at 646, 634 S.E.2d at 927. Additionally, after approximately fifteen minutes into the questioning, and after repeated denials by the juvenile, the juvenile was subjected to a search of his person by the SRO. Further, the juvenile was detained by the SRO for an additional one and one-half hours until his mother picked him up. Id. Based on the totality of the circumstances, this Court held that "a reasonable person standing in the place of the juvenile would have believed that he was restrained in his movement to the degree associated with a formal arrest." Id.
Unlike W.R., the totality of the circumstances in the present case would not lead a reasonable person in J.D.B.'s position to believe he was "in custody or that he had been deprived of his freedom of action in a significant way." Buchanan, 353 N.C. at 338, 543 S.E.2d at 827. Although the juveniles in both cases were middle-school students and were questioned by several adults, including police officers, the circumstances in the present case do not include the same indicia of restraint as W.R. Unlike W.R., the record indicates J.D.B. was informed and indicated he understood that he did not have to answer any questions and was free to leave at any time. Further, J.D.B. was not detained for over an hour, but was released after half an hour. However, most notably, J.D.B.'s person was not searched during the questioning. Based on the totality of the circumstances in the instant case, a reasonable person would not have believed he was restrained in his movement. Therefore, I concur in the majority opinion affirming the trial court's denial of J.D.B.'s motion to suppress.
BEASLEY, Judge, dissenting.
The issue is whether the court's findings of fact support its conclusion of law that the juvenile (J.D.B.) was not in custody when he was questioned by Detective DiCostanzo. Because I believe that the court's findings of fact clearly show that J.D.B. was in custody, I respectfully dissent.
"[T]he initial inquiry in determining whether Miranda warnings were required is whether an individual was `in custody.'" State v. Buchanan, 353 N.C. 332, 337, 543 S.E.2d 823, 826 (2001). "In Miranda, the Supreme Court defined `custodial interrogation' as `questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'... The Supreme Court of North Carolina [has recognized that] `in determining whether *802 a suspect [is] in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.'" Buchanan, 353 N.C. at 337, 338, 543 S.E.2d at 826, 828 (quoting Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694, 706 (1966); and State v. Gaines, 345 N.C. 647, 662, 483 S.E.2d 396, 405 (1997)).
"[U]nder Miranda, whether an individual is in custody is a mixed question of law and fact. Accordingly, ... we review the trial court's conclusions of law for legal accuracy and to ensure that those conclusions `reflect[] a correct application of [law] to the facts found.' In doing so, this Court must look first to the circumstances surrounding the interrogation and second to the effect those circumstances would have on a reasonable person." State v. Garcia, 358 N.C. 382, 391, 597 S.E.2d 724, 733 (2004) (quoting State v. Golphin, 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000)) and citing Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383, 394 (1995) (internal quotation omitted).
Review of the trial court's findings of fact makes it clear that J.D.B. was in custody at the time of his initial inculpatory statements. Findings 1 through 5 state, as relevant to the issue of custody, the following:
1. [In September 2005, homes] were broken into and various items were stolen, including jewelry [and] a digital camera.
2. The juvenile, at the time 13 years old, was interviewed by police on the same day as the break-ins after he was seen behind a residence in the same neighborhood.
3. ... [P]olice were informed that the juvenile had been seen in possession of [the stolen] digital camera at school[.]
4. Investigator Joseph DiCostanzo of the Chapel Hill Police Department ... went to the juvenile's school to speak with him.
5. The juvenile is in the seventh grade and enrolled in special education classes.
These findings establish that J.D.B. was a thirteen year old seventh grader in the special education program at his school. The majority opinion correctly notes that an objective standard governs the issue of custody, and that J.D.B.'s "mental capacity and age, standing alone, are not determinative of whether he was `in custody' for purposes of Miranda and N.C. Gen.Stat. § 7B-2101(a)." However, the fact that J.D.B. was a middle school aged child is certainly among the circumstances relevant to "whether a reasonable person in [J.D.B.'s] position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." Buchanan, 353 N.C. at 339-40, 543 S.E.2d at 828. To hold otherwise would lead to the absurd result that, when required to determine whether a "reasonable person in the defendant's situation" would consider himself in custody, courts would apply exactly the same analysis, regardless of whether the individual was eight or thirty-eight years old. Id.
Findings of fact 6 and 8 state:
6. The juvenile was escorted from his class and into a conference room to be interviewed. Present in the room were Investigator DiCostanzo, Assistant Principal David Lyons, a school resource officer and an intern. The door was closed, but not locked.
....
8. Investigator DiCostanzo asked the juvenile if he would agree to answer questions about recent break-ins. The juvenile consented.
I would hold that J.D.B. was in custody after: (1) he was escorted by a uniformed school resource officer, rather than being allowed to report to the office on his own; (2) he was taken to an office and the door was shut; (3) four adults were in the room with J.D.B., including Police Officer DiCostanzo, the school resource officer, an assistant principal, Mr. Lyons, and an administrative intern; and (4) Officer DiCostanzo asked *803 J.D.B. to answer questions about recent crimes.
The majority opinion notes that J.D.B. was not subjected to the more severe indicia of physical control, such as the application of handcuffs, a locked door, or an armed officer standing guard. However, the offense was nonviolent, and J.D.B. was outnumbered by two police officers, a school administrator, and another adult. J.D.B. presented no threat to the officers' safety. They had no reason to hold J.D.B. at gunpoint, handcuff him, or lock the door, precisely because J.D.B. was a thirteen year old in a closed room with four adults. I conclude that the mere absence of these circumstances contributes little to our analysis.
Furthermore, even assuming, arguendo, that J.D.B. was not yet in custody, the next findings of fact remove any doubt about his situation:
9. The juvenile stated that he had been in the neighborhood looking for work mowing lawns and initially denied any criminal activity.
10. Mr. Lyons then encouraged the juvenile to "do the right thing" and tell the truth.
11. The investigator questioned him further and confronted him with the fact that the camera had been found.
12. Upon the juvenile's inquiry as to whether he would still be in trouble if he gave the items back, the investigator responded that it would be helpful, but that the matter was still going to court and that he may have to seek a secure custody order.
Thus, after J.D.B. answered the officer's questions, he was not released to return to class and the law enforcement officers and assistant principal made it clear that they would not accept his answers.
An argument can be made that Mr. Lyons acted as an agent of the police when he participated in their interrogation of J.D.B. by urging J.D.B. to "do the right thing" and "tell the truth." See State v. Morrell, 108 N.C.App. 465, 470, 424 S.E.2d 147, 151 (1993) ("when an accused's statements stem from custodial interrogation by one who in effect is acting as an agent of law enforcement, such statements are inadmissible unless the accused received a Miranda warning prior to questioning").
The following excerpt from the hearing transcript amplifies the factual background of finding of fact 12. Officer DiCostanzo testified that when J.D.B. denied involvement in the break-ins, he confronted him with the fact that witnesses had seen J.D.B. in possession of a camera that was identified by serial number as the one taken in a recent break-in. He testified further:
DISTRICT ATTORNEY: Did [J.D.B.] make any response to thisyou having found the camera?
OFFICER DICOSTANZO: He really remained quiet ... like he wasn't sure what he wanted to say. And that's when [the assistant principal] you know, was encouraging him, said that he had had long conversations with [J.D.B.], said he really wanted [J.D.B.] to do the right thing because the truth always comes out in the end. [J.D.B.] asked at this point if he got the stuff back was he still gonna be in trouble? And I told [J.D.B.] that it would help to get the items back but that, quote, this thing is going to court. I specifically said, what's done is done, [J.D.B.], now you need to help yourself by making it right. I told [J.D.B.] that with the information that I had been given, that if I felt that he was going to go out and break into other people's houses again because he really didn't care, then I would have to look at getting a secure custody order. And he asked what that was. And I explained to him that it's where you get sent to juvenile detention before court. And at that time I said, [J.D.B.], you don't have to speak to me; you don't have to talk to me; if you want to get up and leave, you can do so, but that I hoped he would listen to what I had to say. And I said to him, do you understand you're not under arrest and you don't have to talk to me about this. He nodded his head yes, and that's when he just started rambling really quickly about [details of the break-ins.] ...
(emphasis added).
*804 This testimony reveals that after J.D.B. made an incriminating statement (asked whether he would still be in trouble if he returned the stolen items), Officer DiCostanzo informed J.D.B. that he now had enough information that the matter was definitely "going to court." The officer then issued what is best construed as a threat, saying that J.D.B. should "help himself" and that if the officer "felt" that J.D.B. would break into more homes, then he would try to get a secure custody order. By inquiring about the secure custody order, J.D.B. was attempting to understand the consequences of his failure to cooperate with Officer DiCostanzo. The unmistakable implication is that, to prevent Officer DiCostanzo from having the "feeling" that J.D.B. might engage in future break-ins, J.D.B. would have to "help himself" by providing the police with more information.
Officer DiCostanzo's testimony supports the findings of fact, and also establishes that Officer DiCostanzo told J.D.B. he was not required to stay and talk and was not "under arrest" only after (1) J.D.B. was coerced to "do the right thing" and to "help himself"; (2) J.D.B. had made incriminating statements; (3) Officer DiCostanzo told J.D.B. that the case was definitely going to court; and (4) Officer DiCostanzo suggested that unless J.D.B. demonstrated that he was not likely to commit future break-ins, the officer might "feel like" J.D.B. needed to be locked up.
The North Carolina legislature has granted additional protection to juveniles, beyond that required by the holding of Miranda. Under N.C. Gen.Stat. § 7B-2101 (2007), a juvenile who is in custody "must be advised prior to questioning" of his "right to have a parent, guardian, or custodian present" during questioning. Moreover, if "the juvenile is less than 14 years of age, no in-custody admission or confession resulting from interrogation may be admitted into evidence unless the confession or admission was made in the presence of the juvenile's parent, guardian, custodian, or attorney." N.C. Gen. § 7B -2101(a)(3), and (b) (2007). "In my view, the enactment of a lengthy and detailed juvenile code shows great concern on the part of the legislature not only for dealing effectively with juvenile crime, ... but also for safeguarding the individual rights of juveniles. Juveniles are not, after all, miniature adults. Our criminal justice system recognizes that their immaturity and vulnerability sometimes warrant protections well beyond those afforded adults." In re Stallings, 318 N.C. 565, 576, 350 S.E.2d 327, 333 (1986) (Martin, J., dissenting).
The United States Supreme Court has held that, to be legally effective, the required warnings must be given before the suspect is questioned and a confession obtained. Missouri v. Seibert, 542 U.S. 600, 604, 124 S.Ct. 2601, 159 L.Ed.2d 643, 651 (2004) ("midstream recitation of warnings after interrogation and unwarned confession" does "not effectively comply with Miranda's constitutional requirement"). Similarly, Officer DiCostanzo's perfunctory recitation that J.D.B. did not have to talk came only after the boy had "let the cat out of the bag." Thereafter:
13. The juvenile then confessed to entering the houses and taking certain items together with another juvenile.
14. The investigator informed the juvenile that he did not have to speak with him and that he was free to leave. He asked him if [he] understood that he was not under arrest and did not have to talk with the investigator.
15. The juvenile indicated by nodding "yes" that he understood that he did not have to talk to the officer and that he was free to leave. He continued to provide more details regarding where certain items could be located.
16. The juvenile wrote a statement regarding his involvement in the crime.
17. The bell rang signaling the end of the day and the juvenile was allowed to leave to catch his bus home.
18. The interview lasted from 30 to 45 minutes.
To summarize, the findings of fact stated that J.D.B. was sitting in a seventh grade special education classroom, when a uniformed school resource officer arrived and led him away from class. He was taken to a *805 room where he was met by the assistant principal, an intern, and a city law enforcement officer. The door was shut and J.D.B. was asked if he would answer questions about recent break-ins. When he denied wrongdoing, the assistant principal joined in, urging J.D.B. to "tell the truth" and Officer DiCostanzo revealed that he had evidence of J.D.B.'s possession of a stolen camera. J.D.B. then asked if he could get out of trouble by returning the stolen items. Officer DiCostanzo responded to this incriminating question by telling J.D.B. that the case would definitely go to court, warning J.D.B. that if the officer "felt" that J.D.B. would commit more break-ins he might seek an order for secure custody, and urging the juvenile to "help himself." Only after this did Officer DiCostanzo tell J.D.B. that he did not have to answer questions and was not under arrest.
Application of common sense and the correct legal standard to the court's findings of fact leads to an inescapable conclusion that J.D.B. was in custody when he made inculpatory statements. Moreover, the physical evidence obtained as a result of this unconstitutional interrogation was "fruit of the poisonous tree," see Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441, 455 (1963), and should also be suppressed. Accordingly, I respectfully dissent.